**SELF–RELIANCE UKRAINIAN AMERICAN COOPERATIVE ASSOCIATION, Inc. d/b/a Certified Foods, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**Retail Food and Drug Clerks Union, Local 1550, Affiliated With Retail Clerks International AFL–CIO, Intervenor.**

No. 71–1198.

United States Court of Appeals, Seventh Circuit.

May 4, 1972.

George P. Blake, Arthur B. Smith, Jr., Chicago, Ill., for petitioner; Vedder, Price, Kaufman & Kammholz, Chicago, Ill., of counsel.

Neal D. Rosenfeld, Chicago, Ill., for intervenor.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Charles R. Both, Attys., National Labor Relations Board, for respondent.

Before CASTLE, Senior Circuit Judge, KILEY and SPRECHER, Circuit Judges.

KILEY, Circuit Judge.

Petitioner Self-Reliance Ukrainian American Cooperative Association, Inc. (employer) seeks to set aside a Labor Board decision that it violated Sections 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act.[1] We deny the employer's petition and grant the Board's cross-petition for enforcement of the order.

The employer's work force in its neighborhood food store[2] numbered 19 when on December 22, 1969, employee Irene Burtniak began a Union[3] organizational drive. At that time she requested cards from the Union authorizing the Union to act as the employees' bargaining representative. On January 14 the Union orally requested discussion of a contract with the employer, and on January 15 it made a formal written demand for recognition. The employer on January 21 refused recognition, and the Union then filed charges with the Board alleging violation of Sections 8(a) (1), 8(a) (3) and 8(a) (5).

The Examiner, after the hearing, concluded that the 8(a) (1) and 8(a) (3)

1. 29 U.S.C. § 151 et seq.

2. Self-Reliance is a not-for-profit corporation in Chicago, having the purpose of fostering the Ukrainian culture and language among persons of Ukrainian extraction in the Chicago area. It operates this self-service grocery store, under the name of Certified Foods, the trade name for a group of independent grocers in the Chicago area joined in a cooperative organization for joint purchasing and advertising.

3. Retail Food and Drug Clerks Union, Local 1550.

charges were proven, but that the 8(a)(5) charge was not proven. The Board adopted the Examiner's findings, conclusions and recommendations, except as to the 8(a)(5) charge. The Board concluded that the employer had violated Section 8(a)(5) and it ordered the employer to bargain with the Union if requested to do so.

The employees involved in the charges are Irene Burtniak and her daughter Lydia, Debra Romanchuk, and John Chorkawciw. All four were included as "regular part time employees" in the unit for which the Union claimed to be representative. Irene Burtniak had obtained signatures of the other three for Union authorization cards [4] in the period December 25 to December 31, 1969. Except for Irene Burtniak, the employees involved here were teen-age high school students.

The relevant testimony [5] concerns a statement made by Pylawka over the telephone on the afternoon of January 14, and his separate conversations with each of the four employees within the following three day period. The conversations took place after two Union agents, on January 14, with seven authorization cards, had called on Pylawka at the store. When they disclosed their purpose to discuss representing the employees, Pylawka referred them to Datzco, whose office as secretary of Self-Reliance was a few doors away. The employer's refusal to recognize the Union demand for recognition followed.

## I.

The Examiner found that the employer violated § 8(a)(1) of the Act by coercive interrogation of John Chorkawciw and Debra Romanchuk concerning their Union activities. In this appeal, however, the employer directs his argument only to the interrogation of John Chorkawciw.

John Chorkawciw testified that on January 14 Pylawka asked him whether he had signed a Union card. John said he first denied signing, but then admitted signing, after Pylawka told him there was no use lying about it since Pylawka knew everyone who had signed. Pylawka in his testimony admitted talking to John about the Union, but denied saying he knew who had signed the cards.

In cross-examination John was confronted with an affidavit made before the hearing. In the affidavit he had made no mention of Pylawka's inquiry concerning others who had signed the cards. The affidavit, except for this omission, was generally consistent with John's credited testimony. And the statement that he first denied signing a card, before admitting it, is significant. An employer's question concerning union activities which inspires fear among employees is unlawful under the Act, and here the initial denial of signing a card is one of the factors from which the employer's coercion might reasonably be inferred. Bourne v. N L R B, 332 F.2d 47, 48 (2nd Cir. 1964); N L R B v. My Store, Inc., 345 F.2d 494, 497 (7th Cir. 1965). Furthermore, the inquiry was directed toward a high school student, sixteen years of age. We think the Examiner was not required to find that Pylawka's interrogation of John was a mere innocent question for the lawful purpose of learning whether the Union had a card majority, as the letters were held to be in this court's opinion in Lake City Foundry Co. v. N L R B, 432 F.2d 1162, 1175 (7th Cir. 1970).

In view of the context in which the inquiry was made, the Examiner did not

---

4. Employees Peter Joroszenki, Ann Kocelko and David Hubal also signed cards on December 25, December 29 and December 31, 1969, respectively. They are not involved in this proceeding.

5. At the hearing before the Examiner, the testimony of the four employees was contradicted in part and in part uncontradicted. The principal relevant witnesses for the employer were store manager Pylawka and assistant store manager Kurylo.

err in finding an 8(a) (1) violation. Pylawka knew that Union activity was in progress. The finding that the interrogation was coercive is indicated by John's age and his initial denial that he signed the card, and is supported by the whole evidence.

## II.

■ The Examiner found that Irene Burtniak, her daughter Lydia, and Debra Romanchuk were discharged for their Union activities, in violation of § 8(a) (3) of the Act. If their testimony was properly credited,[6] the finding must be sustained as having substantial support in the record as a whole.

Assistant manager Kurylo knew in early December that Irene Burtniak was interested in organizing the employees. The Examiner could properly attribute his knowledge to Pylawka. Thereafter, on January 14 the Union representatives appeared at the store and talked to Pylawka.

### 1. *Irene Burtniak*

■ Irene Burtniak testified that she heard Pylawka talking on the telephone the afternoon of January 14 and that she heard him say, "She is here," and that he had no one to replace her. Later he told her that she did not know how "stupid" she was. The next afternoon he told her that she was "stupid" trying to be a "union leader" and bringing the "union to my store." She testified that Pylawka told her to go home and not to come back until the Union troubles were over and to have her husband Basil talk to him. She left, and was not reemployed at the store.

Pylawka testified that Irene Burtniak "quit" over a dispute concerning conditions of employment. He denied the telephone statements of January 14 and also Irene's version of their conversation the next day. Irene's husband Basil testified that he did talk to Pylawka who told him that Irene was at fault for the Union troubles of the store, and that she could not return to work until the troubles were over.

We are not persuaded by the employer that Pylawka's testimony rather than Irene's should have been credited. Our reading of his testimony supports the Examiner's discrediting Pylawka's story. True, in her pre-hearing affidavit Irene did not state that Pylawka had accused her of being a "union leader" or that Pylawka had used the word "union" in referring to the "troubles." However, she said she later gave an oral statement when she recalled the whole case.

The determination of whom to believe was for the Examiner. He observed Irene Burtniak when she was cross-examined about the omission in her affidavit and was in a proper position to evaluate her explanation. Furthermore, her husband appears to have been a credible witness. His testimony agreed with Pylawka's that they discussed the conduct of his daughter Lydia. However, he also testified that Pylawka said Irene could not work until the Union troubles were over, since they were "her fault."

### 2. *Lydia Burtniak*

■■ Lydia Burtniak testified that she was accused of trying to bring the Union into the store and of trying to "cover up" for Debra Romanchuk who had been accused both of stealing cube steaks and of failing to charge hamburger meat to a customer. Lydia testified that she was also told on January 15 not to come back until the Union troubles were over.

Pylawka admitted that Lydia had been discharged but denied the discharges

6. The employer contends that the Examiner erred in discrediting the testimony of its witnesses and crediting that of the employees. It insists that the testimony of its witnesses is free of "inconsistencies and contradictions" while that of the employees is replete with these imperfections and is too unreliable to support the Board's decision. The employer argues therefore that the Examiner's credibility determinations were arbitrary and that we are required to set aside the Board's order. We reject the contention and argument.

were for her Union activity. He testified she was discharged for "lying" to "cover up for Debra." Lydia's father testified that in his conversation with Pylawka the latter criticized Lydia, but only for neglecting her work by flirting with her boy friend working in the store.

The Examiner credited Lydia's story, and considered in context of events of January 15 we cannot say he erred. Even if Lydia was discharged for both Union activity and for "lying," the Examiner's finding of an 8(a) (3) violation can be sustained since the "lying" incident was not the sole reason for the discharge. N L R B v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964); Nachman Corp. v. N L R B, 337 F.2d 421, 423–424 (7th Cir. 1964).

### 3. *Debra Romanchuk*

■ The last day Debra Romanchuk worked, as cashier, was January 10. She testified that she was subsequently in the store as a customer January 14 and had a conversation with Kurylo. He admitted telling her that she might not be able to work on the 16th because of some "trouble" with the Union. Debra further testified that she had been scheduled to work January 15, 16 and 17, but was unable to do so because of illness. She telephoned Pylawka on January 17 to report her illness. He told her it was "unnecessary" to come to work, asking whether she remembered the trouble "about the meat" and then adding "Well, now we have bigger trouble."

In his testimony Pylawka admitted asking Debra the question but denied making the statement. He testified he intended during the conversation to discharge Debra because of two "meat" incidents involving Debra's work as a cashier.

The first "meat" incident had to do with four cube steaks Debra was accused of taking without paying for them. There is a conflict in the testimony which, if properly credited by the Examiner, would show that Debra paid for the meat. Lydia corroborated the testimony of Debra.

The second incident occurred on January 9 and concerned $6.50 of hamburger meat for which Debra was accused of failing to charge a customer. Kurylo accused her of deliberate dishonesty. The Examiner found that Pylawka wanted Debra fired at once, but that Kurylo advised Pylawka that the store needed her the next day, January 10, because of personnel shortage. Debra worked January 10. Her discharge was on January 17.

We think the Examiner could very well conclude as he did that had Debra been discharged for dishonesty, as Pylawka testified, she would have been discharged on January 9 and not January 17. This would be true normally, particularly in the case of a cashier, where the honesty of the employee is of vital importance to the employer.

The Examiner and Board could well determine on the whole of this record that "but for" their Union activities the three employees would not have been discharged. Mead and Mount Construction Co. v. N L R B, 411 F.2d 1154, 1157 (8th Cir. 1969). See also N L R B v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964).

We hold that the record as a whole supports the Board's decision that the discharges of Irene and Lydia Burtniak and Debra Romanchuk violated § 8(a) (3) of the Act.

### III.

The Examiner decided that the Union did not represent a majority of the employees at the time the demand for recognition was made. In determining that the unit consisted of 14 employees, the Examiner included Christine Pylyporcz and Kurylo. The Board, however, concluded that the appropriate bargaining unit consisted of only 13 employees, and that since there were seven authorization cards signed, the Union accordingly represented a majority of the employees

on January 15. The Board included Irene and Lydia Burtniak and Debra Romanchuk within the bargaining unit, since they had been unlawfully discharged, but excluded Boden Bielynski,[7] Christine Pylyporcz and Kurylo.

The employer contends that the Union did not represent a majority of the workers. It argues that the Board should have included Boden Bielynski, Christine Pylyporcz and Kurylo within the unit. We think the Board did not err in excluding the three employees.

■ The Board found that Boden Bielynski was an accountant working twice annually for five week periods; that contrary to the hourly salary of the other employees, he was paid a flat fee of $25.00 per day; and that he did all his work at home. In our view, Bielynski's exclusion from the bargaining unit was not error since the record as a whole shows that he was not a regular part time employee.

■ The Board also decided that Pylyporcz should have been excluded. It found that she worked in her father's (Datzco's) private office, a few doors away, as his office secretary. And while she did prepare the weekly store payroll, she had no contacts with the other unit employees. The Board found no evidence in the record to support her father's testimony that she worked regularly 12½ hours weekly. And the Board also found that she was not supervised either by Pylawka or Kurylo, as were the other unit employees.

We think the Board's decision that Christine Pylyporcz had no "community of interest" with the other unit employees is supported by the record and is justified. See Indianapolis Glove Co. v. N L R B, 400 F.2d 363, 365 (6th Cir. 1968); see also Cherrin Corp. v. N L R B, 349 F.2d 1001, 1004 (6th Cir. 1969). Here there was something more than the mere family relationship in *Cherrin, supra.*

■ The Board adopted the Examiner's finding that Kurylo was a "supervisor" and excluded him from the bargaining unit. There is ample evidence in the record that Kurylo was paid a weekly salary slightly less than that earned by store manager Pylawka, but significantly higher (nearly twice as much) than the other employees. There is also evidence that Kurylo was known by the other employees as the "assistant manager" and that his responsibilities included the assigning of employees to various tasks and reprimanding them for improper performance. Kurylo was also in charge of the store in Pylawka's absence, subject to close supervision by Datzco. This uncontroverted evidence substantially supports the Board's finding that Kurylo should not be included in the unit.

## IV.

The employer challenges the validity of the Board's order to bargain on the ground that the order lacks the necessary specific findings required under N L R B v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ The Board here found the employer's unlawful conduct was of "such nature as to have a lingering, coercive effect on the employees and the use of traditional remedies" was unlikely to ensure a "fair and free election." It is of course essential that the Board find a causal connection between the unfair practices and the election processes. N L R B v. Drives, Inc., 440 F.2d 354, 367 (7th Cir. 1971); N L R B v. Kostel Corp., 440 F.2d 347, 351 (7th Cir. 1971); New Alaska Development Corp. v. N L R B, 441 F.2d 491, 494 (7th Cir. 1971).

■ We found in *Drives, Kostel* and *New Alaska* as we do here, insufficient compliance with the *Gissel* requirements that the Board, to justify a bargaining order, must make specific find-

---

7. The Examiner found it unnecessary to decide whether Boden Bielynski should be included within the unit, since there were already 14 within the unit without him.

**40**

ings to show the causal relationship between the unlawful practices and the election processes. In *Drives* and *Kostel* we made the analysis and findings required by *Gissel* to sustain the order. For example, we decided not to remand in *Kostel* "in view of the extended time span . . . and the simplicity of the facts": no prior election, 2–5 employees in the work force, youthful employees, a small town store and the seriousness of the unfair labor practices. We made there the requisite *Gissel* "specific findings" conclusive upon the relationship of the "unlawful conduct and the election process." These simple elements were not present in the *New Alaska* case and we remanded for necessary findings.

We shall here, as we did in *Kostel*, make the necessary analysis and findings, since the record here clearly parallels with the record there. The illegal conduct occurred in January, 1969, and the Board's order issued in February, 1971. The dispute is accordingly into the third year. Three of the four employees subject of the unfair labor practices were teen-age high school students, unsophisticated and of likely susceptibility to extraneous influence in deciding about union representation. *Kostel* 440 F.2d at 352. Three other employees in the majority of seven were also teenagers, so that the impact upon the three involved would probably have a pervasive influence upon the others, making the unfair labor practices for that reason more serious than they may otherwise have been. The neighborhood store has few employees and is relatively small. The apparent ethnic character of the neighborhood and store indicates similarity to a small town. And there has been no history of collective bargaining among the store employees and no election has been held. The similarity to *Kostel* is plain.

We conclude, therefore, that here, as in *Kostel,* we have a "less extraordinary case[s]," *Gissel* 395 U.S. at 614, 89 S.Ct. 1918, 23 L.Ed.2d 547, in which a bargaining order is appropriate, that the "possibility of erasing the effects of the past unfair labor practices . . . by an election is slight" and that the "employee sentiment expressed in the cards would better be protected by the bargaining order." *Kostel* 440 F.2d at 353.

In reaching this conclusion we have limited our consideration to the record before us, rather than including in our consideration the factor of employee turnover since the original entry of the bargaining order. We recognize of course that in a grocery store, where much of the work force consists of youthful, regular part time employees, a turnover of employees can be anticipated, and under those changed circumstances an employer would be forced to bargain with a union that does not represent a majority of the employees. For these reasons we think the Board's order should be modified to include a provision for a notice to the employees advising them of their independent right to petition for a new election. The precise wording of the notice is left to the discretion of the Board. *Drives; Kostel* at 353; N L R B v. Copps Corp., 458 F.2d 1227 (7th Cir., decided April 18, 1972).

The Board's order will be enforced as modified.