**PEERLESS OF AMERICA, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 72-1730.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1973.

Decided Aug. 3, 1973.

As Amended Sept. 6, 1973.

Lawrence M. Cohen, Chicago, Ill., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert Sewell, Atty., N. L. R. B., Washington, D. C., for respondent.

Before HASTINGS, Senior Circuit Judge, CUMMINGS and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioner sells and distributes heating and refrigeration products and their components manufactured at its Effingham, Illinois, plant. It commenced operations there in September 1969, and not quite a year later, in August 1970, the Union [1] initiated its campaign to or-

1. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW).

ganize the Company's production and maintenance employees. An open and vigorously contested campaign ensued. On October 2, 1970, the Union claimed to have been designated as the employees' exclusive bargaining representative on the basis of authorization cards and offered to prove its majority status. It requested that the Company bargain with it, but the Company refused, preferring a Labor Board-supervised election to determine the true desires of the employees. Thereafter the Union filed an election petition, and an election was scheduled to be held on January 14, 1971. The election was postponed indefinitely because two days beforehand the Union filed a charge principally asserting that the Company discriminatorily withheld overtime from employees because of union activities and that for the same reason the Company effectuated a layoff on December 18, 1970, substantially reducing its Effingham work force.

The Regional Director refused to issue a complaint because his investigation established, with respect to the first allegation, that the Company did not diminish employee opportunities for overtime after the commencement of the Union's organizational campaign and, with respect to the second, that (1) the layoff occurred after a marked decline in purchase orders without any anticipation of an increase in the foreseeable future; (2) a substantial inventory of manufactured goods was still on hand; and (3) the least senior employees were selected for layoff. However, on March 22, 1971, the Regional Director issued a complaint after the filing of an amended Union charge asserting that between late August 1970 and the middle of the following December the Company committed various violations of Section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 158(a)(1)) and that it refused to bargain with the Union in violation of Section 8(a)(5) (29 U.S.C. § 158(a)(5)) on and after October 2, 1970, the date when the Union demanded recognition while holding authorization cards of a majority of employees in the appropriate bargaining unit. No election was ever held.

The Trial Examiner found no violation in the majority of the alleged instances of conduct violative of Section 8(a)(1) but concluded that the Company had engaged in unfair labor practices defined in that Section and had refused to bargain with the Union in violation of Section 8(a)(5). In recommending that the Company be ordered to bargain with the Union, he stated without further elaboration:

"Before and after the Union's demand for recognition the Company engaged in numerous unfair labor practices of a character inherently capable of affecting the results of any election procedures and requiring in the instant case a bargaining order as the only effective and appropriate remedial relief. I conclude on the basis of the facts herein and on the authority of Gibson Products Company, 185 NLRB No. 74, that the Company's refusal to bargain was unlawful and can only be remedied by an order to bargain."

The Board disagreed with the Trial Examiner's findings of Section 8(a)(1) violations in two instances, dismissed several alleged violations concerning which the Trial Examiner made no findings, and found a violation in one instance where the Trial Examiner had not. With these exceptions the Board adopted the Trial Examiner's Section 8(a)(1) findings. It likewise adopted the Trial Examiner's conclusion that the Company had violated Section 8(a)(5). In this regard the Board agreed that the Union represented a majority of its employees when it sought recognition on October 2, 1970. It decided that the critical date for determining the majority status where no election has been held was the date the Union sought recognition. It held that the Union then had 24 clearly valid authorization cards out of a unit of 39 employees, so that the Union represented a majority of the employees when it sought recognition.

In support of its decision and order requiring the Company to bargain with the Union (198 NLRB No. 138), the Board stated simply:

"The facts show that, as soon as the Union began to organize, Respondent began to undermine the Union. Thus Respondent [1] systematically polled union sentiment, [2] created the impression of union surveillance and [3] directed a supervisor in the presence of an employee to segregate a union supporter,[2] [4] repeatedly interrogated employees about their own and others' union sympathies and about attendance at a union meeting, [5] made repeated efforts to have an employee persuade others to give up their support of the Union, [6] promised a change for the better in working conditions, [7] threatened worsened working conditions, and [8] threatened a plant shutdown and layoff—all in discouragement of union support. These unfair labor practices were directed at undermining union strength and impeding the election process. Applying the standards of N. L. R. B. v. Gissel Packing Co., [395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547], we consider whether there is

still a possibility of ensuring a fair election. We believe that possibility is slight because of the lingering coercive effect of the unfair labor practices. [Footnote omitted.] We therefore hold that the employees' majority designation of the Union as expressed in their authorization cards provides in this case a more reliable measure of the employees' true desires than would be provided by an election."

The Company has requested us to set aside the Board's order, prompting the Board to file a cross-petition for enforcement. We deny enforcement of the bargaining order but, with three exceptions as to the Section 8(a)(1) unfair labor practices, enforce the remainder of the Board's order remedying them.

### Section 8(a)(1) Unfair Labor Practices

First of all, the Board found that the Company thrice violated Section 8(a)(1) when Plant Manager Richard W. Kritzer, Jr. conversed with other supervisors in the presence of his confidential secretary, Vicky Steele. In one conversation which occurred on about September 11, 1970, Kritzer inquired of supervisors Becton, Stigers, Embry and Hardiek[3]

2. The first three allegedly unfair labor practices must be disregarded because they involved Vicky Steele whom we hold to be a supervisor unprotected by the Act (see *infra*). By the systematic polling of Union sentiment, we understand the Board to have referred to the violation found to inhere in Plant Manager Kritzer's meeting with four supervisors in the presence of his secretary, Vicky Steele, considered by the Board as an employee, wherein he asked the supervisors to record the employees' probable Union sympathy against a check list.

3. For the purpose of counting the number of employees in the bargaining unit and in order to upset the Board's conclusion that Embry's unlawful interrogations, threats, and promise of improved benefits and working conditions should be charged against it, the Company disputes the Board's conclusion that Hardiek and Embry were supervisors. (Of course the Company must know that acceptance of its contention would make Kritzer's con-

versation with them and with Embry alone vulnerable to unfair labor practice findings on the basis of their employee status.) However, there was ample evidence for the Board to conclude that Hardiek and Embry satisfied one or more of the criteria for supervisory status as defined in Section 2(11) of the Act. See National Labor Relations Board v. Brown Specialty Co., 436 F.2d 372, 374–375 (7th Cir. 1970). In addition to evidence that they had authority within their respective departments to move employees to different jobs, to apportion work among employees, to direct them in the performance of their work and that they were in sole charge of their respective departments for substantial periods of time, the record shows they possessed many indicia of supervisory status, such as payment by salary rather than hourly wage, payment for illness absences, no payment for overtime, attendance at management meetings, and acceptance as supervisors by Company executives as well as by the rank and

about their knowledge of employees' Union sympathy and asked them to check probable sympathy against an employee check list. This conversation occurred in the privacy of Kritzer's office, but because his confidential secretary was then present, the Board found that "such systematic inquiry and tabulation" coerced or restrained her in the exercise of her Section 7 rights. A few minutes after this conversation, Kritzer engaged in another conversation with Embry, who remained in Kritzer's office after the other supervisors had left. They conferred about who among the employees was the chief instigator of the Union movement and decided it was employee Benny Kessler. Again since Vicky Steele overheard this conversation —she was seated at her desk during both conversations—the Board found it created the impression of surveillance, thus violating her Section 7 rights. When Kritzer and Embry thereupon decided that Kessler should be segregated from the other employees,[4] the Board found still another Section 8(a)(1) violation because this coerced Vicky Steele.

 As the Board concedes, these three violations are premised upon its view that a confidential secretary is an "employee" within the meaning of the Act and therefore entitled to its protections. However, we cannot accept this premise. For the reasons persuasively stated by Judge Craven in National Labor Relations Board v. Wheeling Electric Co., 444 F.2d 783 (4th Cir. 1971), we hold that Mrs. Steele's position as confidential secretary rendered her a supervisor excluded from the protection of the Act by Section 2(3) thereof (29 U.S.C. § 152(3)).[5] Consequently, the finding that the Company committed the foregoing three unfair labor practices is set aside.

The majority of the remaining unfair labor practices found by the Board consist of eight incidents of interrogation concerning Union sentiment; the others involve a promise of improved benefits and working conditions, three incidents of threats, and several anti-Union solicitations.

Plant Manager Kritzer was found to have unlawfully interrogated employee Layton when on or shortly before September 4, 1970, he asked him if he was planning to attend a Union meeting scheduled for that evening, remarking that he should take a pad and pencil and jot down notes. Shortly thereafter Layton signed a Union authorization card. Subsequent to the meeting Kritzer asked Layton how many employees had attended, to which Layton candidly responded, and Kritzer was again found to have made an unlawful interrogation.

The Board found that supervisor Embry[6] made an unlawful interrogation when in the course of a mid-November conversation, which quite possibly occurred in a tavern over beer, he asked employee Shope, apparently a friend, what he thought about the Union. When Shope responded that he had not given it much thought, Embry added that "he didn't think we needed * * * [the Union and that] we would get laid off and they would cause a lot of trouble

---

file. The Board acted well within its "large measure of informed discretion" in finding Hardiek and Embry to be supervisors. National Labor Relations Board v. Henry Colder Co., 416 F.2d 750, 754 (7th Cir. 1969).

4. There is no charge that such segregation actually took place.

5. We disapprove of the contrary view expressed in National Labor Relations Board v. Southern Greyhound Lines, 426 F.2d 1299, 1301 (5th Cir. 1970), which, as the Fourth Circuit noted, relied solely on a Third Circuit case decided before

Congress' redefinition of "employee" in the 1947 amendments to the Labor Act, was barren of any reference to the legislative history of those amendments, and seems not to have been necessary for decision. National Labor Relations Board v. Wheeling Electric Co., 444 F.2d 783, 786–787 n. 4 (4th Cir. 1971). The *Wheeling Electric* holding was recently approved by the Second Circuit in Bell Aerospace Co. v. National Labor Relations Board, 475 F.2d 485, 494 (2d Cir. 1973).

6. See note 3 *supra*.

and close the factory down." Embry was thus also found to have threatened Shope with the loss of his job. Similarly Embry was found to have engaged in unlawful interrogation of employee Ferchow and to have threatened him when in the course of two or three talks with Ferchow during the last three months of 1970 he asked Ferchow what he thought he could gain from the Union and whether he thought it was a good idea to have one at Peerless and when on one occasion Embry stated "Old man Kritzer [the plant manager's father] in Chicago would rather shut down the Effingham plant than let a union come in there." To Embry's query, Ferchow candidly responded, " * * * yes, I did, I thought it [the Union] was a good idea." Although the Trial Examiner disagreed, Embry was also found to have unlawfully promised employee Dorothy Stevenson improved benefits and working conditions. The basis for this finding was Miss Stevenson's testimony that early in October 1970 Embry approached her, stating "I don't believe we need a union." When she expressed her disagreement, he said, "he thought we could get the problems ironed out amongst ourselves, that they realized they made mistakes and they would try to do better from here on out, and that he thought we should give Mr. O'Connor [the Company's president] enough time, maybe six months, I'm sure he can get things patched up." In response Miss Stevenson told him, "they had had enough time and they should have thought about that sooner."

Extrusion Superintendent Julian Becton was found to have made three illegal interrogations and a six-fold unlawful solicitation of employee Jack Stevenson. On one occasion, on November 21, 1970, Becton came over to employees Casselman, Broeringmeyer, Davidson and Schmoe and stated, "I know how Ray [Casselman] and Ernie [Schmoe] feel about the union, I want to know how you other two feel." Broeringmeyer and Davidson "sort of grinned" and did not respond, whereupon Becton walked away. On the second occasion a couple of weeks later, Becton asked employee McCormick if he knew an applicant for employment named Schultz and, receiving an affirmative reply, he asked what kind of a fellow he was, whether he worked hard, how he felt about the Union and whether he could be persuaded to "swing" their way. To the last two questions, McCormick responded that he didn't know. On the third occasion, occurring about the same time, at the outset of a conversation with employee Charlene Ricketts in which Becton pointed out the benefits the Company had conferred on its employees, Becton asked her what she "felt about this whole thing" and whether given a second chance she didn't think the Company could "solve these problems without an outsider." Miss Ricketts acknowledged the Company's good treatment in the past but told Becton she saw advantages in a third party. The conversation closed with Becton querying whether he could count her "on our side," Miss Ricketts telling him she did not wish to reveal her feelings, and Becton's expression of hope that he could count on her. In regard to the incidents of unlawful solicitation, between December 4 and 11, 1970, the Board found that Becton six times urged employee Jack Stevenson to change his mind about the Union and if he did, to talk with other employees in the plant and try to persuade them to change their minds. Stevenson testified to his reaction: "I told him I would think it over, but, of course, you see, that went on a while. I would stop for a while and get him off my back. Later on I got disgusted and I told him I was for the union and that was it."

Finally, the Board found that Superintendent Stigers twice made an unlawful interrogation and once illegally threatened worsened working conditions. On or about November 14, 1970, Stigers came over to employee Ferchow's work station and after some preliminaries asked him what his attitude was towards the Union coming in to Peerless. Ferchow responded he was in favor of

it, and Stigers related several stories about unions' causing trouble in other plants and expressed his opinion that he thought a union at Peerless would also cause trouble, more than it was really worth. The second unlawful interrogation and the threat were found to have occurred when Stigers asked employee Dorothy Stevenson, in the presence of employee Musser, how she felt about the Union, and, when she told him she thought the employees needed a union, said "[a] union don't do anything but take your dues" and "[i]f the union does get in, they will really crack down on you." In the context of the conversation "they" apparently meant the Company, for Miss Stevenson retorted, "I don't know too much they can do except lay us off."

The foregoing summary of the Section 8(a)(1) violations found by the Board reflects the events according to the Trial Examiner's credibility findings. In many instances the supervisors involved denied or had different versions of the events, but substantial evidence on the record considered as a whole supports the findings of fact. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 489, 71 S.Ct. 456, 95 L.Ed. 456.

█ Whether the unfair labor practice findings predicated on these facts have a reasonable basis in law is a different and closer question. Viewed as discrete occurrences, each of these incidents is marginal at best and taken singly probably would not amount to a violation of Section 8(a)(1).[7] But although the Board treated the incidents individually, it seems clear that its assessment was influenced by the continuing and repeated nature of the supervisors' prying queries and needless remarks and by the entire course of conduct revealed thereby. The Board could reasonably infer an intentional campaign subtly to induce a fear of reprisal for

supporting or expectation of benefit for rejecting the Union. The supervisors' intention alone, of course, will not turn their interrogations and remarks into restraint or coercion unless their words in the circumstances in which they were uttered would reasonably induce such a fear of reprisal or expectation of reward. But on this score, the statement of Judge Learned Hand is appropriate:

"Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used. * * *" National Labor Relations Board v. Federbush Co., 121 F.2d 954, 957 (2d Cir. 1941).

█ The setting in which the interrogations, purported threats and promise of benefits and solicitations were made includes the context of their repetition and continuation. Employees Dorothy Stevenson and Ferchow were found to be the subject of two violations, each perpetrated at the hands of different supervisors, and employee Jack Stevenson was six times solicited to abandon the Union and, if he did, persuade other employees to do likewise. And it could reasonably be expected that in view of the small size of the work force, the other employees found to have been restrained or coerced were aware of the supervisors' efforts directed at others. A continuous course of conduct may be a circumstance coloring employee perception of individual instances of seemingly innocuous conduct. National Labor Relations Board v. Kaiser Agricultural Chemicals, 473 F.2d 374, 381 (5th Cir. 1973); see National Labor Relations Board v. Kropp Forge Co., 178 F.2d 822, 828 (7th Cir. 1949). It should also be noted that in none of the encounters where unfair labor practices were found did the supervisors say anything to assure the employees involved that the

7. See, e. g., Utrad Corp. v. National Labor Relations Board, 454 F.2d 520, 524 (7th Cir. 1972); Sax v. National Labor Relations Board, 171 F.2d 769, 772 (7th Cir. 1948).

Company would respect their sentiment and not stoop to the level of retaliation.

 It is true that the record contains no hint whatever that the employees involved were actually restrained or coerced. In fact, quite the contrary, for one cannot help but come away from the record with a strong sense that the employees involved in the incidents in question were resolute and unintimidated by the supervisors' queries, statements and solicitations. The foregoing summary of the incidents so indicates by the candid and uninhibited employee repartee. But while the indicated ineffectiveness of the supervisors' activities is pertinent to the propriety of a bargaining order and has some bearing on how the supervisors' words may reasonably be taken, it will not vitiate a Section 8(a)(1) finding if the conduct itself, viewed in context, may reasonably induce fear of reprisal or anticipation of reward. In sum, we find this a close question but think there is enough play in the joints to affirm the Board's conclusions as having a reasonable basis in law.

### The Bargaining Order

 Initially we think it would serve no purpose in this case to analyze separately whether the Company violated Section 8(a)(5) and whether the bargaining order was properly issued. Analysis of the latter question under the framework of National Labor Relations Board v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, covers all the essential ground. Because this is hardly one of those " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," where a bargaining order could issue "in the absence of a § 8(a)(5) violation" (*Id.* at 613–614, 89 S.Ct. at 1940), the authority to issue a bargaining order depends upon whether the Union had a valid card majority and whether the Company engaged in "less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940. Since the Company was entitled to reject the Union's recognition demand regardless of its subjective motivation,[8] whether or not the Company violated Section 8(a)(5) likewise depends upon whether the Union had a valid card majority when it made its demand and upon whether the Company engaged in " 'contemporaneous unfair labor practices likely to destroy the union's majority status and seriously impede the election.' " *Id.* at 575, 591, 603, 600, 89 S.Ct. at 1933. Thus it seems that in this case the determination of whether a Section 8(a)(5) violation has been committed involves the same inquiry as whether a bargaining order can properly issue.[9]

In view of the basic rationale of *Gissel*, there is nothing logically inconsist-

---

8. Two exceptions are "however, (1) that an employer could not refuse to bargain if he *knew*, through a personal poll for instance, that a majority of his employees supported the union, and (2) that an employer could not refuse recognition initially because of questions as to the appropriateness of the unit and then later claim, as an afterthought, that he doubted the union's strength." National Labor Relations Board v. Gissel Packing Co., 395 U.S. 575, 594, 89 S.Ct. 1918, 1930, 23 L.Ed.2d 547. Neither exception is applicable here.

9. Arguably, in order to make out a Section 8(a)(5) violation a union would have to show that it had a card majority at the time it demanded recognition whereas a bargaining order could issue if the union, although it did not have a majority at the demand date, acquired one thereafter. See *Gissel, supra* at 614 and the discussion in text *infra*. Assuming this is a correct interpretation of *Gissel*, the distinction may have no practical difference, however, because the Board typically treats the Union's recognitional demand as "continuing." See National Labor Relations Board v. Kostel Corp., 440 F.2d 347, 351 (7th Cir. 1971); National Labor Relations Board v. General Stencils, Inc., 438 F.2d 894, 903 n. 12 (2d Cir. 1971). In this case, as will be shown, the Union had a card majority on the date it sought recognition and thereafter.

ent here in treating the "remedy" analysis of whether a bargaining order should issue as dispositive of whether a Section 8(a)(5) violation has been committed.[10] Contrary to the usual Section 8(a)(5) violations predicated simply on the employer's refusal to bargain with an elected or conceded representative or to do so in good faith, here the Section 8(a)(5) violation is not *per se* established by a refusal to accede to a card majority and has nothing to do with the employer's subjective motivation for that refusal. Rather, it depends upon the effect of employer misconduct upon the preferred election processes, and should take into account possible divergence between union and employee interests, exactly the considerations involved in "fashioning a remedy" of a bargaining order. *Id.* at 594, 614; National Labor Relations Board v. Drives, Inc., 440 F.2d 354, 364–366 (7th Cir. 1971). Consequently, we shall directly address the question of whether the bargaining order is supportable under the *Gissel* criteria.[11]

The Company argues that the Union did not have a valid card majority as of the properly determinative date. First, it contends that January 14, 1971, the date of the scheduled Board election, rather than the date the Union sought recognition, is the appropriate date for determining the Union's majority status. As of January 14, by reason of the extensive but untainted December 18 permanent layoff and normal attrition, the unit which on the recognitional demand date held 39 employees was reduced to probably 16 employees.[12] But even as of January 14, the Company concedes that 9 of the 16 employees had executed Union authorization cards. The Company argues for the January 14 date, apparently thinking it has a better chance of invalidating enough of these cards on the basis of defective solicitation to destroy the Union's slim majority then than it has of destroying its more substantial, 24 out of 39 majority on the date the Union sought recognition.

Since we conclude the Company has no valid objections to the manner in which any of the cards were solicited, it is really unnecessary for the purpose of determining whether the Union had a valid card majority to decide between the October 2, 1970, and January 14, 1971, dates. Nevertheless, even if the Union had lost a valid card majority as of the later date and even though the loss was not attributable to any unfair labor practices, the later date would not be the determinative one. That is not to say that differences in the employee complement should not be considered by

10. Although at one point in its *Gissel* opinion the Supreme Court spoke in terms of "the propriety of a bargaining order as a remedy for a § 8(a)(5) refusal to bargain." *Gissel, supra,* 395 U.S. at 610, 89 S.Ct. at 1938; see also 595), thus seeming to indicate two questions with separate analyses, earlier in discussing when an employer would violate Section 8(a)(5) in refusing a recognitional demand, it clearly equated the two, saying "the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election." *Id.* at 594, 89 S.Ct. at 1930.

11. See National Labor Relations Board v. General Stencils, Inc., 438 F.2d 894, 901–905 (2d Cir. 1971).

12. The Company suggests that the figure is 17 employees including Hardiek, Em-

bry and Austin, who was previously excluded from the bargaining unit as a guard but who by the scheduled election date was apparently performing janitorial duties. The figure 16 counts Austin as well as Hardiek, who by January 14 apparently ceased to have a supervisory status since there were no longer any employees in his department. It does not include Embry whom we have found to have been properly determined a supervisor and whose status was in no way shown to have been changed. By way of caveat we note that no Board determination of the bargaining unit complement on January 14 was made since the Board used the date the Union sought recognition as the critical date, and we suggest the figure 16 only as the maximum probable complement based on the testimony in the record.

the Board in deciding whether to issue a bargaining order.[13] But the Supreme Court made quite explicit in *Gissel* that where, as here, the Board seeks to impose a bargaining order on the basis of less than "outrageous" and "pervasive" unfair labor practices, the Board need only show "that at one point the union had a majority." 395 U.S. at 614, 89 S. Ct. at 1940. If the Union had a valid card majority status on the date it sought recognition, it satisfied this *Gissel* criterion, and it was not incumbent on the Board to show the Union retained that status at the time the election was scheduled. National Labor Relations Board v. Dixisteel Buildings, Inc., 445 F.2d 1260, 1265 (8th Cir. 1971). The Company's only supposedly supporting authority, Central Soya of Canton, Inc., 180 NLRB 546, 547 (1970), does not stand for the Company's proposition.[14]

■ Second, the Company argues that Union misrepresentations in soliciting the authorization cards rendered the Union's claimed majority status invalid. The cards involved here were single-purpose cards stating clearly and unambiguously on their face that the signer was designating the Union to represent him in collective bargaining.[15] In *Gissel, supra,* the Supreme Court approved the Board's so-called Cumberland Shoe (144 NLRB 1268 (1963)) rule relating to such cards whereby "if the card itself is unambiguous (*i. e.,* states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election." 395 U.S. at 584, 606, 89 S.Ct. at 1925. Our review of the record discloses, in consonance with the Board's finding, that the Company did not carry its burden of proof. What the solicitors told the employees was in substance identical to those representations which the Supreme Court specifically found to be within (albeit at the limits of) the *Cumberland* rule's application. *Id.* at 608, 584–585 n. 5. According to the relied-on testimony of those who signed the challenged cards, they were told one or more of the following: that the cards were to be used to petition for an election; that the cards would be used to show interest in the Union and get a Union representative to come to talk about the Union; that a vote would come later. These representations do not suffice to "deliberately and clearly cancel" the language of the cards. *Id.* and 606; Texaco v. National Labor Relations Board, 436 F.

---

13. This Court has taken the position that "later events should not be permitted to preclude enforcement" (National Labor Relations Board v. Kostel Corp., 440 F. 2d 347, 353 (7th Cir. 1971)), but, as the Board appears to concede, a change in the employee complement may be a relevant consideration in deciding whether to issue a bargaining order. See National Labor Relations Board v. Ship Shape Maintenance Co., 474 F.2d 434, 443 (D.C.Cir.1972); National Labor Relations Board v. General Stencils, Inc., 472 F.2d 170, 175 n. 5 (2d Cir. 1972); cf. National Labor Relations Board v. Coca-Cola Bottling Co. of San Mateo, 472 F.2d 140, 142 (9th Cir. 1972).

14. In finding that a bargaining order was not justified in the *Central Soya* case, the Board stated:
"Thus, as the matter stood at the time the General Counsel issued his complaint herein (thereby blocking the re-run election that had been directed by the Board) there was, we find, no substantial basis for belief that a rerun election might not provide a fair test of employee desires." (Footnote omitted)
Instead of focusing upon the critical date for determining the Union's majority status, *Central Soya* aids the Company's later argument that the bargaining order was not justified because on March 22, 1971, when the General Counsel issued this complaint, an election would provide a fair test of employee desires.

15. The authorization card states:
"I, .........., authorize UAW to represent me in collective bargaining.
\* \* \* \* \*
"This card will be used to secure recognition and collective bargaining for the purpose of negotiating wages, hours, and working conditions."

2d 520, 523–524 (7th Cir. 1971); National Labor Relations Board v. WKRG–TV, Inc., 470 F.2d 1302, 1317–1318 (5th Cir. 1973). And we are not persuaded that the Board was unmindful of its own admonition against "a too easy mechanical application of the *Cumberland* rule." *Gissel, supra* at 608 of 395 U.S., at 1937 of 89 S.Ct.

Next the Company contends that a bargaining order is wholly unwarranted in this case, and we agree.

 Under *Gissel*, before the Board could issue a bargaining order in this case it had to find that the Company's misconduct was such "that the possibility of erasing the effects of past practices and of ensuring a fair election * * * by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order * * *." *Id.* at 614 of 395 U.S., at 1940 of 89 S.Ct. We have consistently held that *Gissel* contemplates that the Board must make "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make

"a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies. Self-Reliance Ukrainian American Coop. Ass'n v. National Labor Relations Board, 461 F.2d 33, 39–40 (7th Cir. 1972); National Labor Relations Board v. Copps Corp., 458 F.2d 1227, 1229–1230 (7th Cir. 1972); New Alaska Development Corp. v. National Labor Relations Board, 441 F.2d 491, 494–495 (7th Cir. 1971); National Labor Relations Board v. Kostel Corp., 440 F.2d 347, 351–352 (7th Cir. 1971); National Labor Relations Board v. Drives, Inc., 440 F.2d 354, 365–367 (7th Cir. 1971). But once again the Board has failed to give a satisfactory explanation of its decision.[16] Instead it has a proffered a list summarizing in general terms the employer's Section 8(a)(1) violations, as if any interrogations, threats, promise of benefit and solicitations of whatever intensity, whenever, however, and in whatever context made were the equivalent of all others imaginable. See National Labor Relations Board v. General Stencils, Inc., 472 F.2d 170, 173 (2d Cir. 1972).[17] It has then simply concluded

---

16. In *Gissel*, the Supreme Court attributed to the Board an expertise in estimating "the effects on the election process of unfair labor practices of varying intensity." *Id.*, at 612 n. 32 of 395 U. S. at 1939 of 89 S.Ct. But that presumed expertise does not relieve the Board of its responsibility to explain its conclusions in terms reviewing courts can understand. Insofar as they can be discerned, it is beginning to appear that many of the Board's expert assumptions about the impact of employer misconduct on employee voting behavior are invalid. See Getman and Goldberg, The Myth of Labor Board Expertise, 39 U.Chi.L.Rev. 681 (1972). Nevertheless, until they are conclusively invalidated, we must accept plausible assumptions in this area, but require their articulation and particularized application to the facts of each case.

We recognize that the determination of the immediate and residual impact of unfair labor practices may be a difficult task. *Id.* at 686–688. But by "specific findings" in this regard we hardly mean

that the Board must determine how many employees actually were caused to abandon the Union. We mean only that it estimate the impact, taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact. This is, after all, what the courts which have made their own analyses have done. Similarly the "detailed analysis" of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those factors which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

17. Here, as in that case, the Board is guilty of the " 'fallacy of the lonely fact' and the further fallacy of using the same word to cover wholly unlike situations."

that the "possibility [of ensuring a fair election] is slight because of the lingering coercive effect of the unfair labor practices" and that "the employees' majority designation of the Union as expressed in their authorization cards provides in this case a more reliable measure of the employees' true desires than would be provided by an election." This substitution of conclusion for explanation does not permit a reviewing court to do its job. Atchison, Topeka and Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 817, 93 S.Ct. 2367, 37 L.Ed.2d 350; National Labor Relations Board v. Kostel Corp., *supra*, 440 F.2d at 352. And the problem is accentuated where, as here, a court vacates one or more of the Section 8(a)(1) violations comprising the "totality of circumstances" on which the Board relied without explanation in issuing the bargaining order. National Labor Relations Board v. General Stencils, Inc., 438 F.2d 894, 902 (2d Cir. 1971).

Furthermore, the Board also failed to attempt to reconcile the bargaining order in this case with prior decisions in which no bargaining order was issued despite what certainly seem to have been equally serious if not far more serious threats to the election process.[18] Absent any self-evident basis for differentia-

tion, we cannot responsibly guard against administrative arbitrariness unless the Board explains in what respects this case differs from the others. National Labor Relations Board v. Kostel Corp., *supra*, 440 F.2d at 352; National. Labor Relations Board v. General Stencils, Inc., *supra*, 438 F.2d at 902, 904–905; See Atchison, Topeka and Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 805–807, 93 S.Ct. 2367, 37 L.Ed.2d 350.

With the case in this posture, ordinarily the proper course would be to remand the bargaining order question to the Board so that it could decide whether the remaining unfair labor practice findings would support the order and, if so, supply the missing findings and analysis, and attempt to reconcile the order with those seemingly more deserving situations in which none was issued. We are mindful of the Supreme Court's admonition that "it is for the Board and not the courts, however, to make [the bargaining order] determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity." *Gissel, supra,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939. However, by this, the Court hardly "meant totally to overrule in this area the famous statement in Universal Cam-

---

18. See e. g., General Steel Products, 199 NLRB No. 121 (1972); Restaurant Associates Industries, 194 NLRB No. 172; Olin Conductors, 185 NLRB 467 (1970); Central Soya of Canton, Inc., 180 NLRB 546 (1970); Blade-Tribune Publishing Co., 180 NLRB 432 (1969); Stoutco, Inc., 180 NLRB 178 (1969); Schrementi Bros., 179 NLRB 853 (1969).

In a footnote in its decision the Board did attempt to distinguish this case from one other case, Motown Record Corp., 197 NLRB No. 176, wherein no bargaining order was issued. But simply dramatically characterizing (or mischaracterizing) the misconduct here as "flagrant, extensive, and far-reaching; [having] covered a much longer period of time; and [having] included direct threats of discharge and plant closing, as well as promises of benefits" and appraising the misconduct in the other case as "neither extensive nor of such a nature as to have a lingering effect that could not be erased

by the Board's traditional remedies" is hardly a very persuasive differentiation. Furthermore, the Board's unilluminating description of the unfair labor practices involved in *Motown* failed to mention that one consisted in a supervisor's, on the express instruction of management, picking out a "trusted" employee and impressing upon him the futility of accomplishing any improvements by voting for the union by means of a chart which demonstrated a 99% likelihood of no improvement if the union won the election and a 34% likelihood that things would improve without a union. Also if the union lost there was only a 1% possibility that trouble-makers (union organizers) would leave the company. What is more pertinent is the finding that the supervisor told the employee to relate their discussion to the other employees and that the employee did so by preparing a similar chart and explaining it to the other employees.

era Corp. v. NLRB, * * * that 'Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function,' including the responsibility placed on them by the Administrative Procedure Act * * * to prevent capricious determinations by administrative agencies." National Labor Relations Board v. General Stencils, Inc., *supra,* 438 F.2d at 904. We conclude on analysis of the simple facts involved that we would be abdicating our judicial function and shirking our responsibilities if we ever enforced a bargaining order in this case. Consequently, in our desire to avoid needless and futile delay, we shall make the essential analysis and deny enforcement. National Labor Relations Board v. Ship Shape Maintenance Co., 474 F.2d 434, 442 and n. 23 (D.C. Cir. 1972); Harper & Row Publishers, Inc. v. National Labor Relations Board, 476 F.2d 430, 435 (8th Cir. 1973); see Self-Reliance Ukrainian American Coop. Ass'n v. National Labor Relations Board, 461 F.2d 33, 40 (7th Cir. 1972); National Labor Relations Board v. Kostel Corp., 440 F.2d 347, 352 (7th Cir. 1971); see also the history of General Stencils, Inc., 178 NLRB 108 (1969), vacated and remanded as to the bargaining order, 438 F.2d 894 (2d Cir. 1971), bargaining order reissued, 195 NLRB No. 173 (1972), enforcement denied, 472 F.2d 170 (2d Cir. 1972).

The sustainable Section 8(a)(1) violations involved here were only marginally so. That is, the reasonable capability of the interrogations, threats, promise of benefits and solicitations to induce a fear of reprisal or expectation of benefits was a very close question, resolved in favor of the Board only deferentially by viewing the incidents as parts of a course of conduct.[19] But because they might reasonably be thought to induce such fear or expectation hardly means the employees involved were actually coerced or that their voting sentiments would be affected. Were it otherwise

the Supreme Court would not have required an inquiry into the effect of second category unfair labor practices on the election process [20] nor posited "a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." *Gissel, supra* 395 U.S. at 615, 89 S.Ct. at 1940. What may reasonably be thought capable of dampening the exercise of Section 7 rights may be far short of what it takes to change an employee's mind about the need for a union.

It is difficult to comprehend how the sturdy and sophisticated American working man would be brought to the point of abandoning his pro-union voting intention by incidents like these. Employee reaction to the supervisors' queries and remarks affirmatively indicates that the employees involved in the incidents were actually undaunted by them. Typically, employee reaction to the supervisors' casual queries and threats was candid and uninhibited, as the earlier summary of the incidents shows. What clearly emerges is a picture of employees with enough hardiness and confidence in their Union and their rights as not to be cowed by these marginal indiscretions. See National Labor Relations Board v. General Stencils, Inc., 472 F.2d 170, 173 (2d Cir. 1972) and 438 F.2d 894, 903 (2d Cir. 1971). Indeed, the supervisors' efforts, at least in the case of employee Jack Stevenson, were counterproductive. Cf. Getman and Goldberg, *supra* n. 19, at 694.

Moreover, the Union campaign continued at full tilt. Employees continued to hold meetings in the presence of supervisors on the plant premises. They spoke openly with the supervisors, including the Company's president and plant manager, about their Union allegiance and continued to make Union posters and paraphernalia at their work stations.

19. The intention or deliberateness reflected by a course of conduct has nothing to do with employee reaction. See Getman and

Goldberg, The Myth of Labor Board Expertise, 39 U.Chi.L.Rev. 681, 689 (1972).

20. See *Gissel, supra* at 614–615.

With any immediate impact as dubious as it is here, it is unreasonable to expect a continuing effect which would preclude a fair election. Quite the contrary, for here not only is there no hint of any later misconduct which might reinforce earlier violations but the Company did make an affirmative effort to dissipate any possible employee apprehension. See National Labor Relations Board v. Drives, Inc., *supra*, 440 F.2d at 362–363, 367. Shortly after the Union filed its amended charge, Company president O'Connor came to the Effingham plant and addressed the employees. He told them that if any of the alleged wrongful conduct had occurred, although he did not think any had, it was against his express instructions[21] and would not recur, and he assured them that the Company respected and would not interfere with their decision on Union representation.[22] Although O'Connor surely interjected his preference was not to have a union, this he had a right to do, and his words were hardly those of a corporate president contemplating a shutdown if the Union was adopted.

As far as the likelihood of recurrence of the misconduct is concerned, there is nothing on which reasonably to predict such an eventuality. The record shows no history of anti-Union animus. In addition to the O'Connor speech, the Company offered "to discuss with [the Board] any other action which [it] might believe necessary to assure the holding of a fair election, such as Union use of Company bulletin boards, a speech by Union representatives during working hours or any similar steps which [it] might deem appropriate." Aside from a predisposition to distrust, we see no reason to dismiss this as subterfuge.

The entry of the Section 8(a)(1) cease and desist order and notice we are sanctioning will itself be of considerable significance in connection with a possible fair election for two reasons. First, the order will provide added protection against the likelihood of the recurrence of misconduct, and second, the posting of the order finding the Company guilty of unfair labor practices will almost certainly have a favorable impact on the Union's chances for success in the election.

Finally, we take note of the substantial reduction of the plant's work force. While there was no substantial employee turnover, nevertheless a marked decrease in the number of bargaining unit employees deserves some consideration, not only because the division of sentiment among the remaining employees may be different, but also because employees may view the benefits of unionization in a far different light when the economic plight of their employer has substantially diminished their ranks. To be sure the changed composition of a work force unrelated to any employer misconduct is not a fatal objection to the entry of a bargaining order (Franks Brothers Co. v. National Labor Relations Board, 321 U.S. 702, 703–705, 64 S.Ct. 817, 88 L.Ed. 1020; National Labor Relations Board v. Drives, Inc., 440 F.2d 354, 366 (7th Cir. 1971)), but it is equally true that "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." *Gissel, supra* 395 U.S. at 614, 89 S.Ct. at 1940. Since it is the present work force that stands to be deprived of exercising its free choice in the preferred election process, the fact that it is substantially different from the one which existed at the time of the misconduct militates against issuance of a bargaining order where, as here, that drastic remedy is not otherwise clearly warranted. Here it simply reinforces our conclusions that

21. At the outset of the Union campaign, O'Connor gave the supervisors a set of instructions as to employee rights under Section 7 and as to what was forbidden conduct on the part of management personnel.

22. A written version of the speech was posted on the plant bulletin board and was to remain there for 60 days.

**1122**

a bargaining order is clearly unwarranted.

In summary, we do not think reasonable minds could help but conclude that on analysis the unusual remedy of a bargaining order is a wholly unnecessary encroachment on employee free choice in this case and that the concededly superior election process should take its course.

In view of the foregoing, we deny enforcement of paragraphs 1(b), 1(f), and 2(a) of the Board's order and direct that the notice specified in paragraph 2(b) be modified accordingly. In all other respects the Board's order is enforced.