**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MEDICAL MANORS, INC., d/b/a Community Convalescent Hospital and Community Convalescent East, Respondent.**

**No. 73–1763.**

United States Court of Appeals, Ninth Circuit.

May 15, 1974.

Charles I. Cohen (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C., Roy O. Hoffman, Director, Region 20, NLRB, San Francisco, Cal., for petitioner.

J. Richard Thesing (argued), of Littler, Mendelson & Fastiff, San Francisco, Cal., for respondent.

Before BROWNING and TRASK, Circuit Judges, and GRAY,* District Judge.

PER CURIAM:

This case comes before the court upon the application of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., for enforcement of its order against Medical Manors, Inc. d/b/a Community Convalescent Hospital (Hospital West) and Community Convalescent East (Hospital East). The Board's January 10, 1973, decision (201 NLRB No. 27) held that the hospi-

* Honorable William P. Gray, United States District Judge from the Central District of California, sitting by designation.

tals violated Sections 8(a)(1) and (5) of the Act by unilaterally implementing a change in employee health insurance coverage and by refusing to bargain with an incumbent union.

The hospitals, located in Vallejo, California, are separate corporations engaged in the business of operating convalescent hospitals for profit. They are managed by a common administrator. In 1968, the Hospital and Institutional Workers' Union, Local 250, Service Employees International Union (Union) was certified as the collective bargaining representative of separate units of housekeeping, dietary, and nursing employees at each hospital. On October 1, 1968, Hospital West entered into a collective bargaining agreement with the Union effective until July 31, 1971, and from year to year thereafter. Hospital East entered into a similar contract with the Union on June 23, 1969. Both agreements contained the identical provision for employee health insurance coverage which stated: "The Employer agrees to cover all eligible employees with a Group Health Insurance Plan . . . ." The Hospital East contract provided that the employer would bear the entire premium costs from the second and third years of the contract, while the Hospital West contract provided that this cost would be borne by the employer beginning the third year only. At no time during negotiations for either contract did the parties discuss any specific health insurance plan.[1]

The hospitals implemented the insurance provision in 1970 by enrolling interested employees in a plan which was sponsored by the California Association of Employers (CAE), an organization to which the hospitals belonged and which had represented the hospitals during bargaining negotiations with the Union. However, on August 3, 1971, the hospitals were notified that their participation in the CAE health plan was being terminated as a result of the hospitals' earlier unrelated election to withdraw from the CAE organization. Shortly after receipt of this notice, the hospitals enrolled the two employees who were then still covered by CAE insurance (a third chose to cancel) in a more beneficial Kaiser health program. This selection was made without notification to the Union,[2] which during this period was negotiating a new contract with the hospitals. Moreover, the new contract proposals included a provision for employee selection of the Kaiser plan or another similar program at the employee's option. The hospitals consistently rejected the contract proposals.[3] The Union continued to negotiate unsuccessfully with the hospitals until December 1971. At that time the joint administrator of the hospitals received decertification petitions signed by a majority of workers at each unit and withdrew further recognition of the Union as the bargaining representative.[4]

The NLRB found that the hospitals' unilateral insurance change for two employees constituted an unfair labor practice tending to undermine employee confidence in the Union. More significantly, however, the Board concluded that

1. The hospitals assumed that the provision imposed upon them the implementation of the provision.

2. Nor, apparently, to any other employee apart from the three whose coverage by CAE was being terminated.

3. As pointed out by the Trial Examiner the negotiations over the contract proposals presumptively included many subjects such as "wages, hours of work, union security, shift differentials, vacations and sick leave." With the record incomplete on overall negotiations he could not find that the rejection

of the hospital plan proposals was in bad faith and thus amounted to an unlawful refusal to bargain. C.T. at 29.

4. The Trial Examiner stated that the record provided no basis for denying authenticity to the signatures on the Deauthorization [sic] Petitions, "and there is no evidence that either Respondent had any responsibility for the origin or circulation of either document. In short, I take both Deauthorization Petitions to be what their language purports them to be."

this misconduct precluded the hospitals from relying upon the decertification petitions and withdrawing recognition of the Union. A mandatory bargaining order was accordingly issued by the Board.

■ We believe that the enrollment of two employees in the Kaiser plan during the period when insurance plans were the subject of collective bargaining did constitute a marginal violation of section 8(a)(1) and we affirm the Board's finding on this point. However, we do not find support in the record for the Board's second conclusion that this insubstantial technical violation vitiated the effectiveness of the decertification petitions. That is, apart from the Board's bare conclusion that the changeover "would have a natural tendency to undermine the Union's effectiveness as a bargaining instrument in the eyes of the employees, and its majority representative status," evidence of a causal connection between the hospitals' misconduct and the Union's loss of representative status is lacking.

To be distinguished are cases such as Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1943) (where the union lost its majority status as a direct result of the employer's aggressive anti-union activities, including the firing of union members) and NLRB v. Sky Wolf Sales, 470 F.2d 827 (9th Cir. 1972) (where the employer was actively involved in the circulation of decertification petitions). In each of these cases as in NLRB v. C & C Plywood Corp., 413 F.2d 112 (9th Cir. 1969), there was "substantial evidence" to support the finding that the employer's unfair practice contributed to the loss of majority status. Such was not the case here, and we therefore conclude that the hospitals' refusal to bargain in December 1971 following receipt of the decertification petitions was not unlawful. We follow the lead of the Seventh Circuit in treating the refusal to bargain and appropriateness of a mandatory bargaining order as interrelated questions in this instance. Peerless of American, Inc. v. NLRB, 484 F.2d 1108 (7th Cir. 1973) (relying heavily upon the Supreme Court's analysis in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 123 (1969)). We necessarily conclude that the bargaining order was inappropriate.

For the reasons stated, enforcement of the Board's mandatory bargaining order is denied.

GRAY, District Judge (concurring):

I agree that the enforcement of the Board's mandatory bargaining order must be denied. However, I would deny such enforcement because I am unable to conclude that, under the circumstances, the enrollment of the two employees in the Kaiser health program constituted even a marginal violation of section 8(a)(1).