SATRA BELARUS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–1214.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1977.

Decided Jan. 12, 1978.

William E. Glassner, Jr., Robert B. Corris, Milwaukee, Wis., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Patrick J. Szymanski, John D. Burgoyne, Attys., N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, CUMMINGS, and TONE, Circuit Judges.

SWYGERT, Circuit Judge.

Satra Belarus, Inc. (the Company) petitions to review and set aside an order of the National Labor Relations Board. The Board cross-petitions for enforcement of its order, 226 N.L.R.B. No. 124. The Board adopted the decision of the administrative law judge, finding that the petitioner had violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by unlawfully interrogating employees as to the identity of persons handing out union authorization cards and by discriminatorily discharging two employees for union activity. We deny the Company's petition and grant the Board's petition for enforcement, with certain modifications.

I

In January 1975 the Company, which sells and services imported tractors, opened a warehouse and service facility in Milwaukee. Initially the Company hired only one permanent warehouseman, Ron Sheldon, and used temporary service agency employees for additional help. On June 12 Robert Brady, a university student, was hired to replace one of the temporary employees as a warehouseman. Brady originally intended to return to school in the fall, but later notified the Company that he would not be returning to school and would continue working past mid-August.

After the Company received its first large shipment of parts on June 23, Sheldon, Brady, and an agency employee spent about five weeks unpacking and stocking parts. From the end of July through mid-August, the Company obtained additional warehousemen through agencies to help handle a second large shipment; their employment was of short duration. On August 13 the Company hired William Hayes and on August 21 obtained the services of Barton Crabbe through an agency. These two, along with Sheldon and Brady, unpacked and stocked parts and performed other duties.

During the last week of August, the Company received a third large shipment of parts which was stored in a bonded warehouse. About two weeks later, after the first shipment and virtually all of the second shipment had been unpacked and placed in stock, Sheldon and Crabbe were sent to the bonded warehouse to work on the third shipment. Meanwhile, a shipment of front-end loaders and extra buckets arrived and was unloaded by Brady and three service department employees on September 20.

On September 24 Sheldon notified the warehouse manager, Don Braun, that the 26th would be his last day of work for the Company. Also on the 24th, Brady and Crabbe passed out union authorization cards to the warehouse and service department employees. That afternoon an inventory control employee went to Braun's office, gave him one of the union cards, and told him that the cards had been passed out. Although the employee said that he had received his card from Hayes, he did not say who had passed out the cards. Later when Braun asked service department foreman Robert Klusmeyer if he knew who was circulating the cards, Klusmeyer replied he did not. Klusmeyer, in turn, asked Arnold Berger, a service employee, whether he was aware that union cards were being distributed and, if so, who was doing it. Berger refused to name anyone.

On the morning of the 25th, Braun met with the three remaining warehousemen, Hayes, Brady, and Crabbe, told them that Sheldon was leaving, that Hayes would take over as leadman, and that there was "much work to be done." He also told them that he was pleased with their work and hoped they could work together as a team. (At that time the second shipment required only a few more days of work; however, the third shipment required a great deal of unpacking and stocking. Additionally, the Company's warehouse had to be inventoried and straightened out, and the entire stock relocated.) That same morning, Braun asked Hayes who had passed out the union cards. Hayes said that Crabbe and Brady were responsible and that he thought they had received the cards the night before from a union representative. The next day, the 26th, Braun met with three company officials, showed them the union authorization card, and reported that cards had been passed out to employees two days earlier. Braun told the officials that "there was no action required since the two individuals would no longer be with us," that "there need not be any concern about . . . the fact that cards were being passed out in that these were not permanent employees of [the Company] and in fact, would be leaving." At quitting time that same day, Braun told Brady and Crabbe that each was being laid off for lack of work.

## II

The Company contends that the Board erred in determining that it committed unfair labor practices both through interrogation and discriminatory discharges of employees. We address these issues separately.

## A

■ Although interrogation of employees is not *per se* unlawful, *L. C. Cassidy & Sons, Inc. v. NLRB*, 415 F.2d 1358, 1361 (7th Cir. 1969); *NLRB v. C & P Plaza Dep't Store*, 414 F.2d 1244, 1248 (7th Cir. 1969), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 756, 24 L.Ed.2d 754 (1970), it need not be explicitly threatening to be coercive within the meaning of section 8(a)(1). If the conduct itself, viewed in context, may reasonably induce fear, it constitutes a violation of the Act. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1115 (7th Cir. 1973); *Blue Flash Express, Inc.*, 109 N.L.R.B. 591, 593 (1954).

The interrogation charge here focuses on the questioning of two employees by supervisory personnel in an attempt to discover the identity of those distributing union authorization cards. The Company argues that regardless of whether the five-factor test developed in *Bourne v. NLRB*[1] or the more general test stated in *Hughes & Hatcher, Inc. v. NLRB*[2] is applied, the interrogations were merely innocuous and not

---

1. 332 F.2d 47 (2d Cir. 1964). The five factors include: (1) the background of employer-employee-union relations; (2) the nature of the information sought; (3) the questioner's identity; (4) the place and method of interrogation; and (5) the truthfulness of the reply.

The Second Circuit has more recently held that the presence of three of the five factors was enough to support a finding of coercive interrogation. *NLRB v. Scoler's, Inc.*, 466 F.2d 1289, 1291 (1972).

2. 393 F.2d 557, 563 (6th Cir. 1968).

coercive conduct. We do not agree. Despite the absence of a history of company hostility and discrimination, and the suggestion that the Company's attempt to learn the identity of the organizers was for "informational" purposes, we agree with the Board that the questioning of the two employees, Berger and Hayes, was coercive interrogation and a violation of section 8(a)(1).

The administrative law judge found that Berger's refusal to reveal the identity of the distributors was the result of fear of reprisal. The Company attempts to refute that finding by noting that in response to a question at the hearing, Berger replied that no reprisals were carried out against him for refusing to identify the card distributors. The relevant consideration, however, is not whether reprisals were actually taken, but whether the employer's conduct was such as would tend to interfere with the free exercise of employee rights, *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946), or would reasonably induce fear of reprisal. *Cf. Peerless of America, Inc., supra.*

The administrative law judge also found that neither Berger nor Hayes was either informed of any lawful purpose for the interrogation or assured that there would be no reprisal. Although these latter two findings alone would not establish a violation of section 8(a)(1), they are nonetheless important considerations because the absence or presence of such comments is relevant to an understanding of the "total context of the surrounding circumstances." As the Sixth Circuit noted in *Hughes & Hatcher, Inc. v. NLRB*, 393 F.2d 557, 563 (6th Cir. 1968), "In order to determine accurately whether the interrogation would reasonably have been coercive, it must be viewed and interpreted as the employee must have understood the questioning and its ramifications."

The Company also asserts that when dealing with the interrogation charges the Board impermissibly considered the next day's discharge of Brady and Crabbe. We agree that the interrogation and discharge charges must be considered separately. The Board, however, could permissibly consider the nature of the information sought in relation to subsequent events. Not only did the interrogations appear to be seeking information on which to base later action against individual employees, *Bourne*, 332 F.2d at 48, but such action was taken the very next day. In sum, we find substantial evidence in the record as a whole to support the Board's conclusion that the interrogations were violative of section 8(a)(1).

### B

An employer violates sections 8(a)(3) and (1) of the Act if the discharge of an employee is motivated, at least in part, by antiunion considerations. *Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677, 680–81 (7th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970). Here the Board was presented with evidence suggesting both business and antiunion motivations for the discharges. Although acknowledging the unfavorable timing, the Company asserts that the terminations were dictated by completion of the work for which the two men had been hired. Such a position, however, is refuted by the evidence of Braun's statement, on the day before the terminations, that there was much work to be done and that he hoped the men would work well as a team. Braun also had spoken shortly before to Crabbe about permanent employment. The Board found that the Company still had much work to be done, but had merely postponed that work.

Since we find substantial evidence in the record to support the Board's finding that the ground stated by the Company alone would not have led to the discharges, and that Brady's and Crabbe's discharges were motivated by impermissible antiunion discrimination in violation of sections 8(a)(3) and (1), we will not disturb that finding.

### III

The remaining issues are whether the company was denied due process and

whether the reinstatement of Brady and Crabbe is proper. We are of the view that the due process contention is without merit and requires no discussion.

On the issue of the scope of the remedy, the Company argues that assuming *arguendo* there were a violation of sections 8(a)(1) and (3), any relief in the nature of reinstatement and backpay would be improper because the two men were temporary employees. The Board responds that reinstatement is proper because the administrative law judge's findings that Brady and Crabbe were not temporary is supported by substantial evidence: first, that Brady was no longer a temporary, summer student employee, and, although not yet formally a permanent employee, was employed for at least an indefinite time; second, that Crabbe had been told that he was being considered for a permanent position and would have been informed of that change on September 26 but for his organizing activities.

We agree with the Company and hold that the evidence does not support the proposition that the discharged men were more than "temporary" employees although less than permanent. Neither employee received the fringe benefits that were normally available to the Company's permanent employees. Moreover, there is no evidence in the record that either the Company or the two employees involved ever considered their status "permanent."

■ This holding, however, does not preclude the remedy ordered by the Board. As the Board correctly notes, the purpose of the order is to place the employees in the position they would have been in but for the discriminatory discharges, and the terms of the reinstatement and the amount of backpay should be worked out in compliance proceedings. *NLRB v. Dazzo Products, Inc.,* 358 F.2d 136, 138 (2d Cir. 1966).

For the foregoing reasons, the Company's petition to set aside the Board's order is denied. The Board's cross-petition for enforcement is granted as modified.