**PELTON CASTEEL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–2360.

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1980.
Decided July 18, 1980.

Mary Pat Koesterer, Quarles & Brady, Milwaukee, Wis., for petitioner.

Robert Tendrich, N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT and CUMMINGS, Circuit Judges, and NICHOLS, Associate Judge.*

---

\* The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

SWYGERT, Circuit Judge.

The National Labor Relations Board found that Pelton Casteel, Inc. had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging an employee and by conducting individual interviews of several of its employees during a union organization drive. Upon appeal, we fail to find substantial evidence in the record as a whole to support the Board's conclusions and therefore deny enforcement of the Board's order.

## I.

Pelton Casteel manufactures metal castings in two plants in Wisconsin. Approximately eighty of the company's two to three hundred employees work at the plant in Oak Creek, Wisconsin, which opened in April 1977. Employees in the finishing department normally work an eight-hour shift five days a week, but are at times required to work overtime. Although paid a minimum base rate, employees can make up to three times their base rate by earning additional percentage or incentive pay pegged for each type of metal casting actually worked on. Pelton has a progressive disciplinary system operating on a moving year basis. Only after a sixth instance of discipline within a twelve-month period is an employee subject to discharge.[1]

John Seward, the employee whose discharge is at issue, was hired by Pelton in April 1963. He was transferred to the Oak Creek plant shortly after it opened, where he and four other employees each ground rough spots off small castings weighing up to thirty-five pounds.

Seward's disciplinary record was good through June of 1977. From 1963 through June 1977 Seward received only two verbal warnings and a one-week suspension and was absent six times without calling in to advise his supervisor. During this period, the United Auto Workers conducted two

1. Under the system, the first and second incidents lead to verbal warnings, the third to a verbal warning that is written up, the fourth to a written warning, the fifth to a one-week layoff, and the sixth to discharge.

organizing drives among Pelton's employees. In the first, which culminated in a representation election that the union lost, Seward signed a union authorization card. In the second campaign, in 1975, which ended without the union petitioning the National Labor Relations Board for a representation election, Seward was more active, passing out union literature in front of the plant. None of the discipline imposed on Seward during this period is alleged to have resulted from his union activity.

During the nine months following July 1, 1977, however, Seward was disciplined on six different occasions and ultimately discharged. On July 7, 1977, Seward received a verbal warning for insufficient production on the larger castings, on which he had temporarily been working. On September 8, 1977, Seward received a verbal warning for being absent from his work station outside the authorized break period, an infraction he had allegedly committed often about that time. On October 12, 1977, Seward received another warning, this time for excessive absenteeism. On November 1, 1977, Seward's foreman, Jimmy Konieczka, issued a written warning to Seward, citing him for deficiencies in "his conduct, attitude, attendance and work record." Seward refused to sign the warning, as apparently was normal practice, because he claimed not to understand the language of the warning. On November 14, 1977, Seward was suspended for a week for walking off the job without authorization after working seven of the eight scheduled hours of Saturday overtime. On March 24, 1978, Seward allegedly did not call in, as company policy required, to inform the company that he was not going to be at work that day. After investigation of the incident and a review of Seward's record, Pelton officials fired him.

In the months preceding November 1977, Seward made various complaints about his working conditions. During the summer of 1977, Seward began complaining to Pelton officials about the rates being paid the five small-casting finishers for work done on a type of casting known as an "ajax." On one occasion three or four of the employees together told the general foreman, Herbert Ginner, that they felt that the ajax job rates were too low, with Seward becoming very argumentative. Ginner asked Seward to come to his office to continue the discussion, but Seward instead returned to work. Seward was never disciplined specifically for this incident, and Ginner testified that he forgot about the matter. There was also some evidence that Seward complained about the rates on other jobs and that a few other employees complained individually about rates on castings, including the ajax.

Seward also complained about working overtime, both Saturday work and extra hour during the week. There was testimony that some other Pelton employees also did not like overtime and that they complained separately to Pelton officials. In addition, Seward complained about the practice of rotating a small casting finisher to the large casting side when there were not enough small castings to keep all the small finishers busy for an entire day. Seward contended that, because of a high school injury, working on large castings hurt his back. Seward had a history at Pelton of taking sick leave status because of back problems, but never had produced a doctor's letter requested by Pelton indicating any physical limitations on the work that Seward could perform.[2]

Between November 1977 and February 1978, a third UAW organizing drive occurred in which John Seward was the principal employee-organizer. According to Seward, he and some other employees decided sometime in October to try to organize a union. Seward called UAW headquarters toward the end of October and helped set up employee meetings with a UAW representative on November 15 and December 15. Union authorization cards were first

---

**2.** In addition, Seward testified that he was not able to make the production minimum while working on large castings because of his back, but general foreman Ginner testified that Se-

ward had made the minimum on the large side on a number of occasions. The Administrative Law Judge did not resolve this apparent conflict in the evidence.

passed out at the December meeting, and arrangements were made to funnel signed cards back to the union through Seward. Seward also talked to other employees during breaktime and called some of those attending the meetings at home. Seward testified that he continued to receive union cards in January and February, but was not sure that he received any in March. The union received only about two dozen authorization cards during the campaign from employees at both Pelton plants and never filed an election petition with the Board. The evidence was conflicting about when Pelton officials learned of the campaign and of Seward's role in it, and the Administrative Law Judge did not resolve the conflict.[3]

The employee interviews, the other violation found by the Board, occurred during December. Foreman Konieczka had the approximately fifty employees under him come into his office one at a time. He showed them a union card, asked if they knew its significance, and requested that they read it carefully. During at least one of these interviews, Konieczka showed the employee a letter written by Pelton's president opposing unionization. Konieczka testified that he did not call in Seward because he knew that Seward was pro-union.

## II.

On the basis of this testimony, the Administrative Law Judge held that Seward's firing constituted a violation of § 8(a)(1) but that the employee interviews by Konieczka were merely a permissible attempt by the employer to present its position on the union organization campaign. On the discharge issue, the ALJ found that all aspects of Pelton's disciplining of Seward were permissible except its consideration of Seward's "poor attitude and conduct" at the time of the November 1 warning and again at the time of discharge. According to the ALJ, this phrase referred to Seward's protests and complaints throughout the summer of 1977 about the rates paid on the ajax casting and his resistance to mandatory overtime. On several occasions, he found, other employees joined in making protests about the rates. After noting without citation that the Board has held that an employee's protests about his wages and working conditions that are not only to his benefit but also to the common good of all employees are within his § 7 right to engage in concerted activities, the ALJ concluded that Seward's complaints about job rates and overtime were protected activities. These concerted activities were related to Seward's later union activities, according to the ALJ, because mandatory overtime and Pelton's unilateral setting of job rates motivated the 1977–1978 organization campaign. Because Seward's engaging in protected, concerted activity was "a reason" for the November 1 warning, the ALJ reasoned, that warning was invalid. Consequently, Seward's failure to call in absent the following March was only the fifth violation during the preceding twelve months and the discharge was unwarranted.

In addition, the ALJ concluded that the discharge was unwarranted because those making the decision in March 1978 reviewed Seward's prior record and considered Seward's poor attitude, which again related to Seward's protected protests about overtime and rates in the summer of 1977.

The Board affirmed the rulings, findings, and conclusions of the ALJ on this issue and adopted his recommended order.[4]

---

**3.** The company maintains that it learned of the campaign and of Seward's role sometime during December, about the time that union authorization cards were distributed. According to Seward, on either the first or second Saturday in November he unwittingly asked Vice President Sotski's son whether he was interested in the union. According to Sotski, his son told him about the incident immediately after it had occurred, sometime in December.

**4.** The ALJ stated that the complaint issued by the Regional Director of the Board alleged that Seward's discharge violated both § 8(a)(1) and § 8(a)(3), but based his order solely on the former subsection. Pelton contends, and we agree, that the complaint, as opposed to the original charges filed by the UAW, alleges only that the discharge violates § 8(a)(3). Because we deny enforcement of the Board's order on other grounds, we need not consider whether the reliance by the ALJ and the Board on a

The Board reversed the ALJ's dismissal of the charge concerning Konieczka's employee interviews. The Board concluded that the company's aim was not to present its position to the employees, but to discover each employee's attitude on the union. The Board noted that no business justification was offered for the questions, that no assurances against reprisal were given, and that the questioning occurred individually in a management office. The Board stressed in particular Konieczka's testimony that he did not call Seward into his office because there was "no sense talking to [him], I knew his stand. I knew how he felt. . . . He was union organized." The Board construed this as tantamount to an admission that the true purpose of the meetings was to discover the employees' sympathies on unionization. Under those circumstances, the Board found the interrogations to have a coercive impact on employees' exercise of their right to become involved in union activity and concluded that this conduct violated § 8(a)(1).[5]

### III.

In the present posture of the case, the task of this court is to determine whether substantial evidence in the record as a whole supports reasonable inferences that John Seward was discharged in part because of his participation in concerted activity and that the employee interviews were coercive. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–90, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 325 (7th Cir. 1976).

### A.

Section 8(a)(1) prohibits an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the Act. 29 U.S.C. § 158(a)(1). Among those rights is the right "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. In employee discharge cases, an employer impermissibly restrains the exercise of § 7 rights by the discharged employee and other employees when it fires the employee because of his protected, concerted activity with the knowledge that the activity was concerted in nature. *Indiana Gear Works v. NLRB*, 371 F.2d 273, 276 (7th Cir. 1967); *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 717 (5th Cir. 1973).

Employees are sometimes fired for a number of reasons. In mixed-motive situations where the analogous charge that a firing violates § 8(a)(3) is brought,[6] at least one circuit has indicated that it will exonerate an employer that shows that it would have discharged the employee absent all unlawful reasons. Under this view, a discharge violates the Act only if any unlawful motive is a "but for" cause of the discharge.[7] However, this circuit has not adopted that standard, and we decline to do so here. A finding of violation requires only that the Board show that the discharge was based in part on an unlawful motive.[8]

Pelton attacks the Board's conclusions on several grounds. First, it argues that it did

statutory provision not alleged in the complaint invalidates the order.

**5.** The complaint issued by the Regional Director of the Board also alleged that Pelton had violated § 8(a)(1) by issuing or maintaining unlawfully broad rules prohibiting distribution of union authorization cards and union literature on company premises. The ALJ dismissed that allegation, and the Board did not overturn that dismissal.

**6.** Section 8(a)(3) bans discrimination in regard to any term or condition of employment to encourage or discourage union membership while § 8(a)(1) prohibits coercion in regard to employees engaging in concerted activity. In

many cases in which a discharge is found to violate § 8(a)(1), it is also found to violate § 8(a)(3). *See, e. g., Satra Belarus, Inc. v. NLRB*, 568 F.2d 545, 548 (7th Cir. 1978).

**7.** *See, e. g., NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979).

**8.** *See, e. g., Chicago Magnesium Casting Co. v. NLRB*, 612 F.2d 1028, 1033–34 (7th Cir. 1980); *Satra Belarus, Inc. v. NLRB*, 568 F.2d 545, 548 (7th Cir. 1978); *Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677, 680 (7th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970).

not discipline Seward on November 1 because he complained about job rates and overtime. Second, it contends that even if it did, Seward's complaints did not constitute protected, concerted activity. Even if those complaints were concerted activity, Pelton further argues, it did not know at the time that Seward's complaints were concerted activity. Finally, Pelton contends that even if the November 1 warning was invalid, the subsequent discharge did not violate the Act. We need consider only Pelton's first two arguments to deny enforcement of the Board's order.

The Board's conclusion that the November 1 written warning was issued in part because of Seward's complaints about the rates on jobs and about mandatory overtime is supported by the record. The written warning itself states that Seward needed to improve "his conduct, attitude, attendance and work record." Both parties direct us to testimony by Jimmy Konieczka, the foreman who issued the warning, for an explanation of the attitude problems mentioned in the warning. That testimony indicates that although, as Pelton contends, unprotected activities such as unwillingness to carry out orders were part of the basis for the warning, the warning was also founded in part on Seward's arguments about the rates paid on particular jobs and about mandatory overtime.[9]

The record does not, however, sufficiently support the ALJ's conclusion, which was affirmed by the Board, that Seward's complaints about rates and overtime in general constituted "concerted activity" protected under § 7 of the Act. As noted above, the ALJ stated without citation that an employee is "within his Section 7 rights to protest an item related to his wages and working conditions which goes to not only the person's good, but the common good of others." He then ruled that Seward's complaints in the summer of 1977 about job rates, which according to the ALJ were made by groups of employees on several occasions, and about overtime satisfied that standard.

■ The ALJ's reasoning is fatally flawed. It is true that to be "concerted activities for the purpose of . . . mutual aid or protection," an employee's actions must concern a wage or working condition that affects more than that individual's interests. See NLRB v. Buddies Supermarkets, Inc., 481 F.2d 714, 720 (5th Cir. 1973); Joanna Cotton Mills v. NLRB, 176 F.2d 749, 752–53 (4th Cir. 1949). The ALJ could reasonably infer here that Seward's complaints partly concerned job rates and overtime, working conditions that affected all employees. It is also necessary, however, that the employee's actions themselves at least contemplate some group activity. As was explained in Indiana Gear Works v. NLRB, 371 F.2d 273, 276 (7th Cir. 1967),

> in order to prove a concerted activity under Section 7 of the Act, it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint.

Thus the actions of an individual employee who acts on his own to enlist the support of other employees for the purpose of mutual aid or protection are as "concerted" as group activities to the same end. See Dreis & Krump Mfg. Co. v. NLRB, 544 F.2d 320, 328 (7th Cir. 1976); Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1365 (4th Cir. 1969).[10] However, public venting of a personal grievance, even a grievance shared by others, is not a concerted activity. See Indiana Gear Works v. NLRB, supra; Mushroom Transportation Co. v. NLRB, 330 F.2d 683, 685 (3d Cir. 1964).

Unprotected personal griping is illustrated by Indiana Gear Works, where an em-

---

9. Pelton also refers us to testimony by General Finishing Department Foreman Herbert Ginner. However, reading more than the section quoted by Pelton indicates that Ginner considered arguing about prices to be part of Seward's bad attitude. [Tr. 191–92.]

10. In this circuit this requirement can be satisfied merely by proof that an individual employee is attempting to enforce provisions of a collective bargaining agreement. NLRB v. Ben Pekin Corp., 452 F.2d 205, 206 (7th Cir. 1971).

ployee was discharged for protesting the small size of a two-cent-an-hour wage increase by adding captions to cartoons cut from newspapers and posting the cartoons in the workplace. Although the employee was assisted by two other employees in this endeavor and the court assumed that other employees shared the employee's view of the wage increase, the court held that the employee's acts were not concerted activities and denied enforcement of the Board's order.[11]

■ In the case at bar, there is little evidence that Seward's general complaints about job rates and overtime were "concerted" in nature. Seward's only testimony about his overtime complaints was that at the time he was given the November 1 written warning, he protested that he was required to work overtime when others were able to excuse themselves. This complaint was thus directed at his personal share of the total overtime worked rather than at the total amount of overtime worked by Pelton employees. In his testimony Seward never expressly linked his complaints about overtime with his pro-union activities.[12] Both Konieczka and Ginner testified that Seward complained generally about overtime, from which one might infer that Seward also complained about the mandatory nature and amount of overtime work generally. Other employees testified that they did not like overtime, which could be interpreted as consistent with Seward's complaints. There was also testimony that

a few employees complained individually about overtime and that overtime was one issue that helped start talk about unionizing in mid-1977. This record is insufficient, however, for a conclusion that Seward's complaints about overtime were directed at inducing collective action or that he intended any of his complaints to be on behalf of other employees.

Similarly, the record does not support a conclusion that Seward's complaints about job rates in general were more than individual gripes. Herbert Ginner testified that Seward argued about job rates, as did two or three other employees, but gave no indication that these complaints, other than those during the one ajax incident, were voiced by groups of employees. Similarly, Konieczka testified that Seward complained about the rates on the ajax castings a number of times during the summer of 1977 and that he had received a few other arguments from other employees. Seward himself did not testify that he complained about job rates at any time other than during the September ajax incident,[13] much less that his complaints at other times were on behalf of others, or that the jobs rates were an issue that helped cause his interest in the union. *See* note 12 *supra*. Thus, as with Seward's complaints about overtime, there is little evidence from which to conclude that Seward saw his job rate complaints generally, or that other employees saw them, as representing others in airing a grievance of common concern.[14]

11. · The trial examiner in *Indiana Gear Works* found the employee's complaint to hold the company's president up to contemptuous ridicule. However, the reasoning of this court was not that the actions, although concerted, were of such a nature as to lose their protection under the Act, *see generally Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 328–29 (7th Cir. 1976); R. Gorman, *Labor Law* 314–18 (1976), but that the actions were not concerted.

12. Seward testified that he started talking with other employees about unionizing in mid-1977. However, his only indication of the issues thought important on the unionization issue was his testimony that the November 15 employees' meeting with the UAW representative concerned job security, management, and discipline.

13. Although Seward's testimony about his complaints to Pelton officials was thus limited, the General Counsel does not argue, the ALJ did not find, and the evidence does not suggest that the November 1 warning was in fact disciplinary action based solely on the ajax incident in mid-September.

14. Any chain of inference linking Seward's discussions with other employees about unionization to his complaints about job rates and overtime is too frail to withstand scrutiny. Testimony from employees other than Seward and from the UAW representative allows a conclusion that these working conditions did underlie in part some employees' desire for a union. From this one might infer that, in making his complaints about job rates and overtime, Seward knew that other employees had these

The General Counsel contends that proof that other employees shared the concerns voiced by the discharged employee is sufficient to support a finding of concerted activity. We disagree. In *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970), the case on which the General Counsel appears to rely most heavily, two employees were fired for complaints made in a two-day period in response to a particular company decision. When told of the decision individually by the foreman, both employees complained. One of the two later loudly voiced his disatisfaction to a supervisor in the presence of other employees. Other employees also complained to the foreman individually about the decision, who then called a meeting for later that afternoon, in which the discharged employees actively and vocally participated. The next day the two indicated to their foreman that they planned to refer to public company statements they felt to be inconsistent with the decision when the matter was brought up again. After these actions were communicated to the company president and their work records reviewed, the two were discharged. In a decision that spawned a dissent on the point, the panel majority held that the totality of the employees' conduct relative to this grievance was sufficient for a finding of concerted activity.

The facts and reasoning of *Hugh H. Wilson Corp.* would not require us to enforce the Board's order. The panel majority characterized the facts as follows: "In sub-stance, the employees had a gripe. They assembled. They presented their grievance to management . . . at the meeting . . . ." 414 F.2d at 1354. We think that although that course of events over two days about a particular grievance can be treated as a coherent whole, Seward's complaints over a course of months about job rates and overtime are too diffuse to be linked together by the one "meeting" here, which concerned one specific casting. In addition, the court in *Hugh H. Wilson Corp.* found the activity to be concerted under a rule of law stated in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964), that this circuit has not adopted: that an activity is concerted if "it had some relation to group action in the interest of the employees." *Compare Indiana Gear Works v. NLRB, supra*, 371 F.2d at 276.[15]

The ajax incident in September 1977 clearly was concerted activity, but that one incident, in the context merely of similar employee complaints about job rates and overtime, is insufficient support in the record to uphold the Board's order on this point. This circuit does not require that an unlawful partial purpose attain the status of a "but for" cause for it to render a discharge unlawful. A colorable inference of a partial unlawful motive may, however, be so insignificant as to be de minimis. *See St. Luke's Memorial Hospital, Inc. v. NLRB*, 623 F.2d 1173, 1179–280 (7th Cir. 1980). We will not lightly infer the existence of an unlawful motive on the part of the employer. *See NLRB v. Wire Products Mfg. Corp.*, 484 F.2d 760, 765 (7th Cir. 1973).

---

same concerns and that he was intending to complain on their behalf. However, Seward himself did not mention either job rates or overtime as considerations in the union question generally.

**15.** To the extent that any of the language in *Hugh H. Wilson Corp.* may be read to support the *General Counsel's* position more directly, we must respectfully disagree with that court.

The case at bar is also distinguishable from *NLRB v. Guernsey-Muskingum Electric Cooperative, Inc.*, 285 F.2d 8 (6th Cir. 1960). *Guernsey-Muskingum* held that individual complaints by three employees to management personnel about their new foreman was concerted activity because there was sufficient evidence from which to conclude that "the men involved considered that they had a grievance and decided, among themselves, that they would take it up with management." *Id.* at 12.

The dictum in *NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 206 (7th Cir. 1971), quoted by the General Counsel does not compel a conclusion contrary to the one we have reached. During the course of that opinion, this court stated that interest on the part of fellow employees is an indication of concerted activity. That language was not intended, however, to mean that proof of a shared concern, without more, is sufficient for a finding of concerted activity.

There is no specific evidence in the record showing that the September 1977 ajax incident was considered in disciplining Seward on November 1. Even if it was, it would have been only one of several complaints about job rates and overtime on which Pelton officials based their assessment that Seward complained about job rates and overtime. That assessment was in turn only one of several items Pelton officials considered in disciplining Seward for a poor attitude, and the only one that was even in part unlawful. Finally, poor attitude was only one of the reasons that Seward was disciplined on November 1. We therefore conclude that any inference that Pelton considered the September 1977 concerted activity in giving Seward the November 1 warning is not a sufficient foundation for a conclusion that substantial evidence exists in the record as a whole to support a finding that Pelton dismissed Seward in part for engaging in protected, concerted activity in violation of § 8(a)(1).[16]

### B.

The ALJ found that the questioning by foreman Konieczka of all the employees under him was not impermissible coercive interrogation violating those employees' rights under § 7, but the Board reversed, finding that the questioning was coercive and was for the impermissible purpose of discovering its employees' attitudes on the union. We cannot find substantial evidence in the record as a whole supporting the Board's conclusion, and we therefore deny

enforcement of this portion of the Board's order.

In this circuit, as in many others, the standard for determining whether an interview is coercive and thus violative of § 8(a)(1) is one that looks "to the totality of the circumstances, including the purpose of the interview, the entire statement made to the employee, and the scope of the questioning." *A & R Transport, Inc. v. NLRB*, 601 F.2d 311, 313 (7th Cir. 1979). *See also Satra Belarus, Inc. v. NLRB*, 568 F.2d 545, 547–48 & n.1 (7th Cir. 1978).

As justification of its reversal of the ALJ's recommendations on this point, the Board relied on the various reasons detailed above, *see* text at notes 4–5 *supra*, the most important of which are Konieczka's reason for not calling in Seward and the location and individual character of the interviews.[17] We cannot construe Konieczka's reason as an admission that the purpose of the interviews was to discover the employees' attitudes toward unionization, as did the Board. In the absence of any circumstances corroborating this interpretation,[18] we construe the reason as the ALJ, who viewed this testimony firsthand, presumably did: it was pointless to call Seward in to present the company's position on unionization because Seward, the principal organizer, had obviously made up his mind on the question. The location and individual character of the interviews are more troubling. It would have been preferable for Konieczka to have

---

16. In addition, although Seward need not have been formally selected as group spokesman for his complaints to have been concerted, *see NLRB v. Guernsey-Muskingum Electric Cooperative, Inc.*, 285 F.2d 8, 12 (6th Cir. 1960), that is a relevant consideration, *see Indiana Gear Works, supra*, 371 F.2d at 276, and we note that there is no evidence that that occurred.

The General Counsel also argues that Pelton's consideration of Seward's poor attitude immediately before discharge, primarily in its review at that time of Seward's disciplinary record, including the November 1 warning, also served to make the discharge unlawful. The relation of Seward's concerted activity in the ajax incident with Pelton's review of Seward's record is no stronger than its relation with the November 1 warning. *See Sioux Quality Pack-*

*ers v. NLRB*, 581 F.2d 153, 157 (8th Cir. 1978). There is simply not enough evidence in the record to support a conclusion that Pelton's treatment of the ajax incident in its consideration of Seward's poor attitude on November 1 and in March was anything other than de minimis.

17. The absence of assurances against reprisal and the fact that Pelton did not give the employees a business justification for the interviews are insignificant considerations on the facts of this case.

18. Indeed, in his testimony about the details of Fields' interview Konieczka stated without contradiction that he did not ask whether Fields had signed an authorization card.

held a group meeting or meetings to exercise the employer's free speech rights.

In light of the other evidence in the record, however, we do not find that "the interrogation reasonably would have been coercive when viewed and interpreted as the employee must have understood the questioning and its ramifications." *First Lakewood Associates v. NLRB*, 582 F.2d 416, 418 (7th Cir. 1978). The only evidence concerning the employee interviews other than the testimony of two Pelton officials was that of employee James Fields. His testimony, the only testimony by any of the fifty or so employees interviewed, gives no indication of any fear of reprisal.[19] In addition, Konieczka was not a high ranking company official, but the workers' immediate foreman. *See Utrad Corp. v. NLRB*, 454 F.2d 520, 524 (7th Cir. 1971). There is no indication that the interviews strayed beyond permissible subjects. Finally, no information was sought from the employees, other than possibly their understanding of the meaning of the union cards; the thrust of the interviews was to inform the employees that Pelton was against unionization.

Therefore, although the interviews were conducted individually in a management office, the record does not indicate that any employee could reasonably have viewed the interviews as coercive. We do not find this record, as a whole, to present substantial evidence of coercive interrogation in violation of § 8(a)(1) and therefore also deny enforcement of this portion of the Board's order.

For the foregoing reasons, the company's petition to set aside the Board's order is granted in full, and the Board's cross-application for enforcement is denied.

19. *Compare First Lakewood Associates v. NLRB*, 582 F.2d 416, 419 & n.2 (7th Cir. 1978) (questioning coercive where the replies of most interrogated employees strongly indicated fear of reprisals, even though one employee was obviously unintimidated).

Indeed, Fields testified that Konieczka asked him not to sign the union authorization card, to which he replied that "I just thought I'd make up my own mind about that."