## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CENTURY MOVING & STORAGE, INC., Respondent.

No. 80–2575.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1981.

Decided July 21, 1982.

Rehearing and Rehearing En Banc Denied Aug. 26, 1982.

---

Mendelspohn McLean, Elliott Moore, N. L. R. B., Washington, D. C., for petitioner.

Julie Badel, McDermott, Will & Emery, Chicago, Ill., for respondent.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and BROWN,* Senior District Judge.

WESLEY E. BROWN, Senior District Judge.

This case is before the Court upon the application of the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., for enforcement of its order against the Respondent, Century Moving & Storage, Inc. (Company). After unfair labor practice charges were filed by Truck Drivers, Oil Drivers, Filling Station & Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union), the Regional Director filed a complaint, and evidentiary proceedings were had thereon before an Administrative Law Judge (ALJ). The ALJ found that the president and sole owner of the Company, Robert Fleming, coercively interrogated employees about union activities in violation of § 8(a)(1) of the Act,[1] laid off two employees in violation of § 8(a)(1) and (3) of the Act,[2] and refused to bargain with the Union as the collective bargaining representative of the Company's employees in violation of § 8(a)(1) and (5) of the Act.[3] Based on these findings and conclusions, the ALJ recommended that the Company be ordered to cease and desist from the above unfair labor practices, to recognize and bargain with the Union upon request, and to make whole Michael Ryan and the estate of William Cork for losses suffered by Ryan and Cork as a result of having been discriminatorily laid off.[4] The Board adopted the findings and conclusions of the ALJ, with the exception that the Board also found Fleming had caused the Company to violate § 8(a)(1) of the Act by promising to grant a wage increase in order to discourage union

---

* The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation.

1. 29 U.S.C. § 158(a)(1).

2. 29 U.S.C. § 158(a)(1) and (3).

3. 29 U.S.C. § 158(a)(1) and (5).

4. William Cork died subsequent to the investigation of the charge and prior to the hearing before the ALJ.

activities. Thus, the Board ordered the Company to cease and desist from the unfair labor practices found by the Board, and from in any other manner, interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them in § 7 of the Act.[5] Adopting the order recommended by the ALJ, the Board also ordered the Company to bargain with the Union upon request, to make whole Ryan and Cork's estate, and to post a prescribed notice to its employees. The issues raised on this application for enforcement of the Board's order are whether substantial evidence on the record as a whole supports the Board's findings of coercive interrogation, unlawful promise of benefits, discriminatory layoffs, and refusal to bargain with the Union, and whether a bargaining order is an appropriate remedy.

Giving full effect to the credibility findings of the ALJ, as adopted by the Board, the salient facts leading to this proceeding appear as follows. Respondent Company is a relatively new enterprise engaged in the moving and storage of household goods. In addition to Fleming and Mark Reddeman, the office manager, the Company employs approximately fourteen others, including full-time and part-time truck drivers, helpers, and an estimator. Fleming spent all of his time driving trucks when the business began in 1976, but increasing administrative duties from September, 1978 until early 1979 decreased his time driving trucks to about half. From early 1979 until April, 1979, Fleming's time was primarily occupied with the move into a new warehouse.

In April, 1979, Union representative Gerald Rzewnicki received an anonymous telephone call concerning possible representation of employees at the Company's warehouse. On Friday, April 27, 1979, Rzewnicki and another Union representative, Bill Dix, arrived outside the rear of the Company's warehouse at about 7:45 a. m., where they met with five Company employees, James Macak, Joseph Prinske, Harry Mazza, Michael Ryan, and William Cork. The group briefly discussed Union benefits and agreed to meet at a nearby restaurant the following Monday, April 30, 1979 at 7:00 a. m. to further discuss union representation. When Fleming arrived at the warehouse on April 27, Edward Adkins, an employee who did not attend the meeting behind the warehouse, informed him that Union representatives were talking to the other employees.

On Saturday, April 28, 1979, a work day, Prinske and Macak approached Fleming in the office area of the warehouse and told him they had met with the Union representatives the day before and that they wanted to talk to him about it. The office is a reception area and general meeting place, and also serves as a lunch and break area. Prinske and Macak told Fleming that a second meeting had been scheduled for Monday, April 30, 1979 at 7:00 a. m. Fleming said that because of the large amount of business to be done April 30, work would begin at 7:00 a. m. Macak and Prinske then stated that their only objective was to obtain a wage increase, to which Fleming responded that he could not afford a further raise. Macak and Prinske said they would not go to another Union meeting if they received a raise, but Fleming repeated that he could not afford to give them one. Fleming then called into the office the other four employees at work that day, Adkins, Cork, Ryan, and Dennis Hartle, and told them he and Macak and Prinske had been discussing the Union and raises. Fleming asked the employees "What's up?" but, before they could respond, asserted that he could not afford to have his employees join the Union. The employees again stated

---

**5.** Section 7 of the Act, 29 U.S.C. § 157, provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

that they were primarily interested in obtaining a raise, and Fleming reiterated that he could not afford to give one. It was suggested by the employees that the Company could raise its rates, but Fleming countered by explaining that this would place the Company at a competitive disadvantage. After reminding the employees that he had promised in March to give an unspecified raise sometime during the summer, Fleming rejected both parts of the employees' offer to accept a $1.00 raise or overtime compensation. Instead, he offered a 25-cents per hour raise effective in June, and stated that he was considering institution of insurance coverage. Fleming then told the employees that if they chose to be represented by the Union, he and Reddeman would have to join too, and the increased costs of paying Union benefits would cause him and Reddeman to assume more truck-driving duties which in turn would cause those employees with lower seniority to be "phased out" or laid off. At the end of the meeting, the subject of the conflict between the Union meeting and the 7:00 a. m. starting time on Monday, April 30 arose. The employees asked Fleming what they should do, and Fleming responded that they had told the Union representatives they were going to be there, so they should "go ahead and go but I have jobs to do and I am going to get them done."

On Monday, April 30, 1979, Macak, Prinske, Cork, Ryan, and Mazza met with Union representatives Rzewnicki and Dix and executed valid Union authorization cards, designating the Union as their bargaining agent. The meeting ended at about 7:30 a. m. and within a few minutes the named employees arrived at the warehouse to find the doors locked, the lights out, and no one present. Fleming had arrived at the warehouse at 6:30 that morning, and had assigned a truck to himself. Reddeman and Tom Hagel, the estimator, who had rarely engaged in moving work, did so that morning, and Adkins drove a truck as usual. Rick Landers, a part-time employee, also drove a truck on April 30. Fleming, Reddeman, Hagel, Adkins, and Landers had all left the warehouse by 7:30

a. m. and did not return until 5:00 or 6:00 p. m., so no one remained at the warehouse to perform work there. That evening Fleming consulted with an attorney who advised him to assign work on the basis of seniority, and Fleming then called Macak and Prinske to tell them to report for work the next day, May 1, 1979.

Fleming was the first to arrive at the warehouse Tuesday morning, May 1, 1979. The two Union agents, Rzewnicki and Dix, were the next to arrive. They introduced themselves to Fleming and presented him with the five authorization cards signed on April 30 and with a collective-bargaining agreement that the Union had negotiated with the Movers Association of Greater Chicago, to which other individual movers had become signatories. Fleming stated that the employees who had signed authorization cards did not constitute a majority of his employees and that he desired to consult an attorney. At that point employees Macak, Prinske, Ryan, and Cork joined Fleming and the Union agents. Fleming told the group that there was no work for Ryan or Cork, and denied that Ryan and Cork were being punished for Union activities when that question was put to him by one of the Union representatives. The explanation given by Fleming was that Cork and Ryan had less seniority than did Fleming and Reddeman, and that the latter two would do moving work that day. After the Union agents and Cork and Ryan left, Fleming drove a truck with Macak and Prinske as helpers, and Hagel and Reddeman performed warehouse duties that in the past had been done by Ryan and Cork.

Ryan and Cork next appeared at the warehouse on May 4, 1979 to receive their paychecks. Reddeman told them that they would be called to work if they were needed. Cork received no work assignment until May 10, and Ryan received no regular assignment until May 17, though he did work one or two days in the interim. The same persons who worked on May 1 continued to do so through May 17, 1979.

In determining whether a finding of coercive interrogation is supported by substantial evidence on the record as a whole, this Court has recognized that interrogation of employees is not per se unlawful, and that the presence or absence of coercion depends upon the surrounding circumstances, reasonably viewed from the employees' perspective. *Satra Belarus, Inc. v. N.L.R.B.*, 568 F.2d 545 (7 Cir. 1978). Several factors which are relevant to evaluating the lawfulness of an interrogation are: "(1) the background of employer-employee-union relations; (2) the nature of the information sought; (3) the questioner's identity; (4) the place and method of interrogation; and (5) the truthfulness of the reply." *First Lakewood Associates v. N.L.R.B.*, 582 F.2d 416, 419 (7 Cir. 1978), (citations omitted). Even if all these factors cut in favor of the employer, there may be interference with, restraint, or coercion of employees in the exercise of rights guaranteed them in § 7 of the Act, in violation of § 8(a)(1). *N.L.R.B. v. Camco, Inc.*, 340 F.2d 803, 804 (5 Cir. 1965), cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). In the case before us, Fleming, the president of the Company, summoned Cork, Ryan, Adkins, and Hartle to the warehouse office, giving the meeting an air of formality in spite of the fact that the office was commonly used by all the employees as a general gathering place. As the Board found, the nature of the meeting changed at that point from the voluntary sharing of information begun by Macak and Prinske. The employees who were called in had not freely chosen to discuss with Fleming their attitudes about Union representation, and his question "What's up?" referring to the Union clearly placed them in the position of having to explain their support of the Union and the reasons therefor. Fleming had already stated his opposition to Union representation. The fact that the employees responded candidly to Fleming's question cuts in favor of a finding of a non-coercive interrogation, but not overwhelmingly so. It is suggested by the Company that the inference of coercion is negated by the fact that five employees attended the Monday Union meeting and signed authorization cards. However, "(t)he test is whether the questioning tends to be coercive, not whether the employees are in fact coerced." *Camco, supra*, at 804, footnote 6.

Also in the present case, there are additional circumstances to be weighed which indicate interference with the exercise of § 7 rights. *Camco, supra*, at 804. First, the Union had not asserted majority status nor had it demanded recognition at the time of the interrogation, and Fleming communicated no valid purpose for the questioning to the employees. Second, the employees were given no assurances that reprisals would not be taken. This Circuit has held such circumstances to be relevant in considering alleged § 8(a)(1) violations. *Satra Belarus, supra; Peerless of America, Inc. v. N.L.R.B.*, 484 F.2d 1108 (7 Cir. 1973); *First Lakewood Associates, supra*. Having considered all of the factors set out above, we find the Board's conclusion that Fleming's interrogation violated § 8(a)(1) is firmly supported by substantial evidence.

Contrary to the ALJ, the Board also found a violation of § 8(a)(1) in Fleming's promise of a wage increase in the April 28, 1979 meeting. We think the fact that Fleming's vague and indefinite March promise of a raise was made both definite and specific, i.e. 25-cents per hour effective in June, during the April 28, 1979 meeting, supports the Board's conclusion that it was made in direct response to the threat of, and in an attempt to avoid, unionization. The employer's motivation in granting benefits is the critical question. Section 8(a)(1)

... prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect. * * * The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove.

*N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, at 409, 84 S.Ct. 457, at 460, 11 L.Ed.2d 435, at 438–439 (1964). The Board's deter-

mination of Fleming's motivation and consequent finding of an illegal promise of a wage increase is supported by substantial evidence on the record as a whole.

It is likewise the employer's motivation on which determinations of "discrimination in regard to ... tenure of employment" turn.[6] The Board found a violation of § 8(a)(3) and (1) in the layoffs or deprivation of work of Cork from May 1 until May 10, and of Ryan from May 1 until May 17, 1979. Thus, the question presented is whether the Board's finding that the Company laid off Cork and Ryan because of their Union activities or sentiments is supported by substantial evidence on the whole record. "Motivation is a question of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence." *N.L.R.B. v. Gogin*, 575 F.2d 596, 601 (7 Cir. 1978), (citation omitted); *W. W. Grainger, Inc. v. N.L.R.B.*, 582 F.2d 1118, 1120–1121 (7 Cir. 1978).

There is evidence that May 1, the day of the alleged layoffs, was traditionally a very busy day for the Company. However, there was no specific evidence that May 1, 1979 was a busy day, as Fleming testified April 30, 1979 was. There was also no specific evidence that business declined on May 1, 1979 and remained depressed until May 17, necessitating the assumption by Fleming, Reddeman, and Hagel of jobs normally done by Cork and Ryan. Fleming testified only that "there was not that much truck work" from May 1 to May 17, 1979. He assigned himself to drive a truck on May 1, but he had driven trucks 50% of the time during April, 1979 and continued to do so after May 1, 1979. Work was in fact assigned on May 1 in order of seniority on the advice of an attorney; Cork and Ryan had the least seniority of those employees who came to work on May 1, 1979. Unlike Adkins, Macak, and Prinske who were assigned work on Tuesday, May 1, Cork and Ryan were not promised a forty-hour work week, but had always been assigned work only when it was available. According to the stipulation of the parties, however, both Cork and Ryan had worked 30 to 40 hours per week prior to May 1, 1979.

The layoffs occurred one day after the second Union meeting, of course, and affected two of the employees who had signed Union cards. On the other hand, Macak and Prinske had also signed Union cards on April 30, 1979, and yet they were assigned work on May 1. Moreover, both the layoffs of Cork and Ryan were of short duration. Fleming had clearly stated his opposition to the Union on April 28, 1979, but he directly denied that Cork and Ryan were being punished for Union activity in response to a question from one of the Union agents on May 1, 1979. Nevertheless, Fleming had predicted the previous Saturday that if the Union represented the employees, he and Reddeman would have to assume more truck-driving duties which would cause the employees with least seniority to be "phased out." The layoffs of Ryan and Cork certainly fit the prediction, though they occurred immediately after the Union demanded recognition, and before any increased costs of paying Union benefits.

It is apparent from the foregoing that "the Board was presented with evidence suggesting both business and anti-union motivations for the (layoffs)." *Satra Belarus*, supra, 568 F.2d at 548. It is not for us to "displace the Board's choice between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, at 488, 71 S.Ct. 456, at 465, 95 L.Ed. 456, at 467–468 (1951). As the Court stated in *Gogin*, supra, 575 F.2d at 601:

> An employer violates Section 8(a)(3) of the Act if the (layoff) of an employee is

---

6. Section 8(a)(3), 29 U.S.C. § 158(a)(3), states in part:

   It shall be an unfair labor practice for an employer—by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ....

motivated, even in part, by anti-union considerations. *Satra Belarus, Inc. v. N.L.R.B.*, supra, at 548.

We have carefully reviewed the entire record and we are convinced that the finding that the layoffs were motivated by anti-union considerations is a fair inference from substantial evidence. Our review on this question is therefore ended, and the Board's finding of a violation of § 8(a)(3) and (1) must be upheld.

▮ The Board also found that the Company violated § 8(a)(5) and (1) in refusing to bargain with the Union, and entered its bargaining order. We treat the question of whether the bargaining order is a proper remedy in this case as subsuming the § 8(a)(5) question, and so only analyze the former. *Peerless*, supra, 484 F.2d at 1115–1116; *First Lakewood*, supra, 582 F.2d at 421–422. In *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court identified three categories of cases in examining the extraordinary remedy of a bargaining order. In the first group, involving exceptional cases, "outrageous" and "pervasive" unfair labor practices make a bargaining order appropriate, even in the absence of a § 8(a)(5) violation, because "their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." *Gissel*, supra, 395 U.S. at 613–614, 89 S.Ct. at 1940, 23 L.Ed.2d at 578. Second, a bargaining order is properly issued by the Board "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.*, 395 U.S. at 614, 89 S.Ct. at 1940, 23 L.Ed.2d at 578. The order to bargain is dependent in these cases upon whether the Union has a valid card majority, and upon the Board's finding "that the possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order; . . ." *Id.*, 395 U.S. at 614–

615, 89 S.Ct. at 1940, 23 L.Ed.2d at 578. Finally, there is a third category of "minor or less extensive unfair labor practices, which . . . will not sustain a bargaining order." *Id.*, 395 U.S. at 615, 89 S.Ct. at 1940, 23 L.Ed.2d at 578.

We regard the propriety of the *Gissel* order on the present facts as a close question. The Supreme Court has cautioned that it is for the Board and not the courts to determine the effectiveness of traditional remedies,

> based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.

*Gissel*, supra, 395 U.S. at 612, 89 S.Ct. at 1939, 23 L.Ed.2d at 577, footnote 32, (citation omitted). Nevertheless, the Board must provide reviewing courts with

> "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process and . . . must make "a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.

*Peerless*, supra, 484 F.2d at 1118, (citations omitted). Where the Board has not given us the benefit of its expertise by making specific findings showing that a bargaining order is justified, we have reluctantly made the essential analysis ourselves, to avoid further delay inherent in a remand to the Board. *Peerless*, supra; *First Lakewood*, supra; *Walgreen Co. v. N.L.R.B.*, 509 F.2d 1014 (7 Cir. 1975). The Board's failure to make the necessary specific findings here causes us to follow this course.

The unfair labor practices in this case consisted of coercive interrogation and an unlawful promise of a wage increase, which occurred at the same one occasion, and the

layoff of one employee for 16 days and the layoff of another for 9 days. Although we do not view these violations as minor, falling within the third category outlined in *Gissel*, neither can they be characterized as "outrageous" and "pervasive". Thus, this is a less extraordinary case in which an order to bargain should issue only if traditional remedies are unlikely to ensure a fair election, which is the "preferred method of establishing (a) union's representative status . . . ." *Red Oaks Nursing Home, Inc. v. N.L.R.B.*, 633 F.2d 503, 508 (7 Cir. 1980). If only the § 8(a)(1) violations were involved here, we would not see the bargaining order question as a close one, since our analysis shows that the coercive interrogation and promise of a wage increase had little immediate or residual impact. These comments by Fleming were made in a single meeting on April 28, 1979; four of the six employees addressed by Fleming, and one other, attended a Union meeting on April 30, 1979, and signed authorization cards. Such plain evidence that the employees were not in fact coerced, though not sufficient to vitiate findings of § 8(a)(1) violations, is significant in determining whether a bargaining order should issue. *Peerless*, supra, 484 F.2d at 1115; *Red Oaks*, supra, 633 F.2d at 510. We have little doubt that a cease-and-desist order, and the posting of notices, would have been found sufficient to eliminate the effects of the § 8(a)(1) violations alone, if the Board had properly considered the effectiveness of those remedies.

The § 8(a)(1) violations were not the only unfair labor practices committed by the Company, however, and it is the § 8(a)(3) layoff violations which present the more difficult point. We are fully aware that violations of this type, involving conduct and complete action as opposed to promises and interrogations, are likely to have more immediate impact and continuing effect. Such "hallmark" violations, it has been said, "will support the issuance of a bargaining order unless some significant mitigating circumstance exists." *N.L.R.B. v. Jamaica*

*Towing, Inc.*, 632 F.2d 208, 212–213 (2 Cir. 1980). On the facts before us, we find that significant mitigating circumstances indeed exist, and our task has been made more difficult by the Board's failure to consider them. First, there was no evidence of a history of anti-union animus nor previous violations on the part of the Company. This, coupled with our upholding of the Board's finding of unfair labor practices and enforcement of the cease-and-desist portion of the order, warrant the conclusion that the Company will not lightly risk contempt proceedings by violating the order as enforced. *Red Oaks*, supra, 633 F.2d at 511. We believe these considerations increase the possibility of holding a fair election to a likelihood.

"To be an unfair labor practice . . . conduct need not have as demonstrably severe an impact on employee rights as conduct requiring a bargaining order." *Red Oaks*, supra, 633 F.2d at 509. The additional reasoning needed to support a bargaining order, including analysis of the significant mitigating circumstances here, is not found in the decision and order of the Board. Although the layoffs had an immediate and probably substantial impact, any residual impact or continuing effect of that action was limited by the Company's reinstatement of Cork 9 days later, and Ryan to regular hours 16 days later.[7] It is noteworthy that the reassignment of work to Ryan and Cork by the Company occurred without any remedial action by the Board. While this does not remove or excuse the previous violations, it makes recurring misconduct less likely, and increases the chances that ordinary remedies would be effective to ensure a fair election. Bolstering our decision that the bargaining order is not supportable is the fact that of the five employees who signed Union cards, Mazza quit his employment with the Company and Cork is deceased. Changes in the employee complement may be relevant to the determination of the proper remedy. *Peerless*, supra, 484

---

7. As pointed out earlier, Ryan had worked one or two days before his full reinstatement on

May 17, 1979.

F.2d at 1117, footnote 13, and 1121–1122; *Red Oaks*, supra, 633 F.2d at 510. In light of the foregoing, we cannot say that "the possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance be better protected by a bargaining order, . . ." *Gissel*, supra. Neither do we believe that the Board could reasonably reach a contrary conclusion.

Due to our decision regarding the impropriety of a bargaining order, it would serve no purpose for us to discuss the issue of the appropriate unit or the Union's majority or minority status therein. Enforcement is denied as to paragraphs 1(d) and 2(a). The notice specified in paragraph 2(d) is to be modified accordingly. In all other respects the Board's order is enforced.

FAIRCHILD, Senior Circuit Judge, concurring in part, dissenting in part.

I respectfully dissent from the part of the opinion which denies enforcement of paragraph 1(d) and 2(a) and requires modification of the notice. In all other respects, I concur.

The decisions of the ALJ and Board are reported at 251 N.L.R.B. 83. The company does not contend they do not adequately summarize the evidentiary facts. I am persuaded that there was sufficient evidence to support the determination that the union was authorized as bargaining representative by a majority of the employees in an appropriate unit. The decision whether to order the company to bargain lay within the Board's discretion. The statements by the ALJ and the Board in support of their decision do not seem to me to be so completely formalistic as to show that the discretion was not truly exercised.